STATE OF NORTH CAROLINA v. IZIAH BARDEN

No. 96A01

(Filed 22 November 2002)

## 1. Confessions and Incriminating Statements— motion to suppress—failure to give Miranda warnings—no arrest or restraint

The trial court did not err in a capital first-degree murder prosecution by denying defendant's motion to suppress evidence of statements he made to police on 5 April 1998 and 16 April 1998 and by allowing the subsequent admission of those statements into evidence at trial even though defendant was not given Miranda warnings, because the totality of circumstances shows that defendant was not in custody in that a reasonable person in defendant's position would not have believed that he was under arrest or that he was restrained to a degree that would cause him to believe he was formally arrested when: (1) for both interviews, defendant voluntarily drove his own car to meet police for questioning; (2) defendant was repeatedly informed both before he agreed to talk with investigators and after he arrived for questioning that he was not under arrest and was free to leave at any time; (3) at no point during the interaction between defendant and the police was defendant ever restrained or confined to the degree associated with a formal arrest; and (4) at the conclusion of each interview, defendant was allowed to go.

## 2. Confessions and Incriminating Statements— motion to suppress—voluntariness

The trial court did not err in a capital first-degree murder prosecution by denying defendant's motion to suppress evidence of statements he made to police on 5 April 1998 and 16 April 1998 even though defendant contends they were not voluntary, because: (1) defendant was offered drinks and cigarettes during one of his interviews; (2) defendant was allowed to use the restroom without being escorted by an officer; (3) defendant was not restrained or handcuffed during either session; (4) neither interview was prolonged; and (5) the record is devoid of any suggestion of physical threats to or pressure exerted on defendant to obtain a statement.

STATE v. BARDEN

[356 N.C. 316 (2002)]

### 3. Search and Seizure— defendant's shoes—bloodstain—voluntariness

The trial court did not err in a capital first-degree murder prosecution by admitting evidence of blood derived from a pair of shoes seized from defendant that he was wearing on 5 April 1998 while he was being interviewed by police, because the totality of circumstances reveals that defendant voluntarily gave his shoes to the police when: (1) defendant was neither placed in a coercive environment where he surrendered the shoes to the officers nor subjected to duress to the point that defendant felt he had no other meaningful choice; (2) a reasonable person in defendant's position would not have believed that he was under arrest; (3) defendant voluntarily provided his shoes to the officers for inspection; and (4) the retention of the shoes did not immobilize defendant since investigators gave defendant a pair of slippers to wear home.

### 4. Jury— capital selection—peremptory challenges— *Batson*—racial discrimination

The trial court erred in a capital first-degree murder prosecution by holding that defendant had not made a prima facie showing of racial discrimination at the time he raised a *Batson* objection to the prosecutor's peremptory challenges of two African-American prospective jurors and the case is remanded to the trial court for the limited purpose of holding a hearing pursuant to *Batson* to give the State an opportunity to present race-neutral reasons for striking these prospective jurors.

### 5. Appeal and Error— preservation of issues—failure to object—jury voir dire—plain error doctrine inapplicable

Although defendant in a capital first-degree murder prosecution contends the trial court erred during jury selection by allowing the prosecutor to make improper comments on defendant's right to testify, to ask prosecutors whether the death penalty is a necessary law, to inject into jury selection the issue of the victim's race, to attempt to establish rapport with prospective jurors, and to make incomplete and misleading statements concerning the sentencing phase during jury selection, defendant has failed to properly preserve these issues for review because: (1) defendant did not raise a timely objection to any of these statements; and (2) our Supreme Court has declined to extend application of the plain error doctrine to situations where a party has

failed to object to statements made by the other party during jury voir dire.

**6. Criminal Law— prosecutor's argument—victim a Hispanic man from Mexico**

The trial court did not abuse its discretion in a capital first-degree murder prosecution by failing to intervene ex mero motu during the prosecutor's opening argument stating that the victim was a Hispanic man who moved here from Mexico even though defendant contends the prosecutor improperly used the victim's race to urge the jury to convict defendant and to pressure the jury to prove that it was not prejudiced against the Hispanic community, because: (1) the statement was a passing reference to the victim's ethnic background in a substantial opening argument; and (2) it was not clear that the reference to the victim's race was improper at all, let alone grossly improper.

**7. Evidence— testimony from victim's supervisor—victim's character—work ethic—responsibleness**

The trial court did not commit plain error in a capital first-degree murder prosecution by admitting evidence from the victim's supervisor about the victim's work ethic and responsibleness, because the evidence was relevant to explain the particular circumstances of the crime including: (1) the victim's various duties and responsibilities; (2) why the victim worked late nights; (3) the victim's work habits; and (4) the victim's payday routine as well as where and how he kept his money.

**8. Evidence— testimony from victim's brother—victim's wallet—in-court identification of victim's wife and daughter**

The trial court did not commit plain error in a capital first-degree murder prosecution by admitting evidence from the victim's brother concerning the victim's wallet, the fact that the victim sent money back to his wife and child in Mexico, and an in-court identification of the victim's wife and daughter, because: (1) the evidence was relevant to explain the victim's habits in handling his salary; (2) the testimony of the witness both describes the victim carrying in his wallet the money received after cashing his paycheck and explains the reasons the victim needed cash; and (3) the mere identification of the victim's wife and daughter at trial does not constitute improper victim-impact evidence.

STATE v. BARDEN

[356 N.C. 316 (2002)]

## 9. Evidence— photograph of victim—relevancy

The trial court did not err in a capital first-degree murder prosecution by allowing the introduction of a photograph of the victim taken three months before his death, because: (1) the photograph was relevant to demonstrate the victim's appearance before the murder and help establish a basis from which the medical examiner could testify as to the various wounds inflicted upon the victim; and (2) it has consistently been held that during the guilt-innocence phase of a trial, a photograph of the victim taken before death is admissible.

## 10. Homicide— first-degree felony murder—motion to dismiss—sufficiency of evidence—armed robbery

The trial court did not err by denying defendant's motion to dismiss the charge of first-degree felony murder even though defendant contends the evidence was insufficient to support the underlying felony of armed robbery, because the evidence reveals that: (1) defendant wanted to borrow more money from the victim, but the victim refused the loan request; (2) the fatal blows to the victim's skull, the taking of the wallet, and the discarding of evidence occurred in an unbroken transaction after the victim turned his back to defendant; and (3) the particular point in this sequence where the robbery occurred is immaterial when the death and the taking are so connected as to form a continuous chain of events.

## 11. Criminal Law— prosecutor's argument—defendant's exercise of right not to testify

The trial court did not err in a capital first-degree murder prosecution by allegedly allowing the prosecutor to improperly comment during closing arguments on defendant's exercise of his right not to testify at trial, because: (1) the prosecutor did not directly implicate defendant's right not to testify, but instead the prosecutor attempted to demonstrate to the jury that defense counsel's argument that the murder was not premeditated could not explain either defendant's statement to the police or the nature of defendant's attack on the victim; (2) even assuming the prosecutor's rhetorical question about why defendant moved the victim's body can be perceived as touching on defendant's decision not to testify, the trial court did not commit error by failing to intervene ex mero motu; and (3) the prosecutor's statements that the State's case was uncontradicted is not an improper

STATE v. BARDEN

[356 N.C. 316 (2002)]

comment on defendant's failure to testify since contradictions in the State's evidence, if such existed, could have been shown by the testimony of others or by cross-examination of the State's witnesses themselves.

**12. Criminal Law— prosecutor's argument—biblical arguments**

The trial court did not err by failing to intervene ex mero motu in a capital first-degree murder prosecution during the prosecutor's biblical arguments, because the prosecutor did not argue that the Bible commanded a guilty verdict, but instead analogized the murder of Abel by Cain to the case at bar to emphasize the importance of the evidence derived from the victim's blood and to point out that the blood "spoke" after the victim had been silenced.

**13. Criminal Law— prosecutor's argument—defendant failed to corroborate defense**

The trial court did not abuse its discretion in a capital first-degree murder prosecution by failing to sustain defendant's objection to the prosecutor's argument that defendant did not call a dentist to corroborate his defense that the victim caused defendant considerable pain by slapping defendant on the cheek when defendant had a toothache, because the prosecutor may argue that a defendant failed to produce a witness or other testimony to refute the State's case.

**14. Criminal Law— prosecutor's argument—voluntary manslaughter**

The trial court did not err in a capital first-degree murder prosecution by failing to intervene ex mero motu during the prosecutor's argument concerning the trial court's submission of voluntary manslaughter, because: (1) the challenged argument correctly stated that voluntary manslaughter did not include the element of malice; (2) the prosecutor was arguing his theory of the case and asking the jury to reject any interpretation of the evidence that would allow it to return a verdict of guilty of voluntary manslaughter; and (3) the jury was notified that the attorneys' arguments were only advocacy while the trial court supplied the law.

**15. Sentencing— aggravating circumstances—felony involving the use or threat of violence to the person—testimony of rape victim**

The trial court did not commit error or plain error in a capital first-degree murder sentencing proceeding by permitting a State's witness to testify to prior events surrounding her attack and rape by defendant in support of the submission of the N.C.G.S. § 15A-2000(e)(3) aggravating circumstance that defendant had been previously convicted of a felony involving the use or threat of violence to the person, because: (1) the State is entitled to present witnesses in the penalty phase of the trial to prove the circumstances of prior convictions and is not limited to the introduction of evidence of the record of conviction; (2) the witness's testimony that defendant's friends told her to do what defendant said while he was attempting to remove her clothes based on the fact that defendant was crazy was not hearsay since it was offered to explain the effect of the words on the victim; (3) the testimony was not too vivid or disturbing to be unfairly prejudicial, and the evidence was admissible to illuminate the circumstances surrounding the prior violent felony committed by defendant; (4) the trial court was not required to strike the testimony that the witness was extremely bitter with defendant since it merely pointed out that defendant's question was accurate in assuming that the witness was embittered but was inaccurate as to the reason; and (5) the witness was not claiming to have testified as to the objective truth.

**16. Criminal Law— prosecutor's argument—improper statement that defendant requested mitigating circumstance of no significant history of prior criminal activity**

The trial court did not err in a capital first-degree murder sentencing proceeding by allowing the prosecutor to improperly comment during closing arguments that defendant requested the submission of the N.C.G.S. § 15A-2000(f)(1) mitigating circumstance that defendant has no significant history of prior criminal activity when defendant specifically requested that the (f)(1) mitigator not be submitted, because: (1) the prosecutor immediately corrected himself during his argument by stating that the trial court would present the mitigating circumstance to the jury; and (2) any misunderstanding was cured when the trial court instructed that the defendant did not seek this mitigating circumstance.

### 17. Criminal Law— prosecutor's argument—facts outside the record

The trial court did not err in a capital first-degree murder sentencing proceeding by failing to intervene ex mero motu when the prosecutor allegedly argued facts outside the record including statements that there was no evidence that the victim slapped defendant and that the victim probably could have lived but defendant did not know that, because: (1) the first statement about the lack of evidence may be read as pointing out that defendant's statement that the victim slapped him was uncorroborated; and (2) the second statement was only a passing comment made in a lengthy argument, and even if defendant had objected, it had no prejudicial effect.

### 18. Criminal Law— prosecutor's argument—race

The trial court did not err in a capital first-degree murder sentencing proceeding by failing to intervene ex mero motu during the prosecutor's closing argument concerning whether the Hispanic victim and his family could receive justice in Sampson County because the argument was not designed to generate an issue of race in the trial but instead sought to remind the jury of the victim's humanity despite the victim's social status and modest economic means.

### 19. Criminal Law— prosecutor's argument—misstatements of law

The trial court did not err in a capital first-degree murder sentencing proceeding by allegedly allowing the prosecutor to misstate the law during his closing arguments including statements that mitigating circumstances were synonymous with excuses, that fewer than all jurors could find an aggravating circumstance, that the jury could return a death sentence based solely on the aggravating circumstances, that misrepresented the significance of Issue Three, and that the jury it had already found an aggravating circumstance of pecuniary gain based on its conviction of defendant for armed robbery during the guilt-innocence phase, because: (1) the statements made by the prosecutor, while not technically correct, were not so misleading that the trial court erred by failing to intervene ex mero motu; (2) any misstatements of law by the prosecutor were cured by proper instructions given by the trial court when it charged the jury; and (3) the prosecutor's statement that armed robbery "is" pecuniary gain was not so wide of the mark as to constitute reversible error.

**20. Criminal Law— prosecutor's argument—voice and conscience of community**

The trial court did not abuse its discretion in a capital first-degree murder sentencing proceeding by allegedly allowing the prosecutor to argue that the jury's accountability to its community should lead it to vote for death, because: (1) the prosecutor properly argued to the jury that it was the voice and moral conscience of the community without suggesting that the jury lend an ear to the community; (2) the prosecutor urged the jury to remember that the final responsibility for the case rested with the jury; and (3) the prosecutor did not contend that the community demanded defendant's execution but instead asked the jury not to do itself and the community the disservice of returning a recommendation of life imprisonment.

**21. Criminal Law— prosecutor's argument—defendant killed victim to eliminate witness**

The trial court did not err in a capital first-degree murder sentencing proceeding by allowing the prosecutor to argue that defendant killed the victim to eliminate him as a witness, because the prosecutor's comments on efforts arguably made by defendant to escape successfully and enjoy the use of the stolen money were not so grossly improper as to require the court to intervene ex mero motu when the robbery and the infliction of mortal wounds to the victim were intertwined parts of a continuous transaction.

**22. Sentencing— victim's good character—impact of crime on victim's family**

The trial court did not err in a capital first-degree murder sentencing proceeding by admitting the State's evidence and argument concerning both the victim's good character and the impact of the crime on the victim's family, because: (1) the testimony from the victim's wife and the victim's brother fell squarely within the reach of N.C.G.S. § 15A-833 and was not so prejudicial that it made the trial fundamentally unfair; and (2) N.C.G.S. § 15A-833 permits introduction of victim-impact evidence at sentencing and although it may have been preferable for the prosecutor to forecast that defendant's lawyer would argue that the jury should not consider such evidence, rather than it could not, it is not impermissible for one side to attempt in argument to address the anticipated arguments of the opposition.

**23. Sentencing— aggravating circumstances—murder espe-
cially heinous, atrocious, or cruel**

The trial court did not err in a capital first-degree murder sen-
tencing proceeding by submitting the N.C.G.S. § 15A-2000(e)(9)
aggravating circumstance that the murder was especially
heinous, atrocious, or cruel, because: (1) defendant borrowed
money from the victim to support a drug habit and struck the vic-
tim on the head fourteen times when the victim refused a second
request to borrow money that same night; (2) at least half of the
fourteen wounds penetrated the victim's skull; (3) while a pathol-
ogist testified that two of the wounds were considered significant
injuries to the victim's head that would likely instantly incapaci-
tate the victim, defendant's statement suggested that the victim
did not die immediately; and (4) viewed in the light most favor-
able to the State, the murder was violent and depraved.

**24. Sentencing— mitigating circumstances—no significant his-
tory of prior criminal activity**

The trial court did not err in a capital first-degree murder sen-
tencing proceeding by submitting the N.C.G.S. § 15A-2000(f)(1)
mitigating circumstance that defendant has no significant history
of prior criminal activity even though defendant's prior criminal
record consists of a 1984 conviction for rape, because: (1) the
presence of some evidence of a defendant's prior violent criminal
activity does not preclude submission of the (f)(1) mitigator; (2)
a defense expert testified that defendant had no significant his-
tory of prior criminal activity and that defendant's behavior on
the night of the alleged crime was out of character for him; and
(3) defendant sought during cross-examination of the rape victim
to convince the jury that the victim's version of the events was
not believable.

**25. Sentencing— aggravating circumstances—mitigating cir-
cumstances—no significant history of prior criminal activ-
ity—prior violent felony**

Although defendant contends the trial court erred in a capital
first-degree murder sentencing proceeding by submitting both
the N.C.G.S. § 15A-2000(f)(1) mitigating circumstance that
defendant has no significant history of prior criminal activity and
the N.C.G.S. § 15A-2000(e)(3) aggravating circumstance that
defendant had been previously convicted of a felony involving
the use or threat of violence to the person, our Supreme Court

has consistently held that the submission of both of these circumstances is proper.

## 26. Sentencing— mitigating circumstances—nonstatutory— defendant's good reputation in community

The trial court did not err in a capital first-degree murder sentencing proceeding by failing to submit defendant's proposed nonstatutory mitigating circumstance concerning defendant's good reputation in the community in which he lives, because: (1) defendant's eight character witnesses who presented evidence of laudable personal characteristics and specific instances of good conduct did not address defendant's actual reputation in the community; and (2) even assuming the trial court did err, the error was harmless beyond a reasonable doubt since the court submitted two mitigating circumstances relating to defendant's character evidence and the jury was not prevented from considering defendant's mitigating evidence.

## 27. Sentencing— mitigating circumstances—nonstatutory— defendant a responsible praiseworthy worker—failure to give peremptory instruction

The trial court did not err in a capital first-degree murder sentencing proceeding by failing to peremptorily instruct on the nonstatutory mitigating circumstance that defendant was a responsible praiseworthy worker who supervisors relied on, because the evidence of this circumstance was controverted by: (1) testimony by one of defendant's supervisors that defendant was given a leave of absence to attend a drug-treatment center; and (2) testimony by a defense expert that defendant's chronic alcohol abuse caused him to lose a number of jobs.

## 28. Sentencing— mitigating circumstances—nonstatutory— defendant a productive member of U.S. Army—failure to give peremptory instruction

The trial court did not err in a capital first-degree murder sentencing proceeding by failing to peremptorily instruct on the nonstatutory mitigating circumstance that defendant was a productive member of the U.S. Army, because: (1) although defendant was a competent soldier and received an honorable discharge during his first term of enlistment, he was convicted of rape during his second term and dishonorably discharged; and (2) the trial court provided a peremptory instruction as to the related non-

statutory mitigating circumstance that defendant was honorably discharged from the United States Army.

**29. Sentencing— mitigating circumstances—inability to appreciate criminality of conduct or to conform to law—failure to give peremptory instruction**

The trial court did not err in a capital first-degree murder sentencing proceeding by failing to peremptorily instruct on the N.C.G.S. § 15A-2000(f)(6) mitigating circumstance that defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired, because: (1) the testimony of an expert witness who has prepared an analysis of a defendant in preparation for trial lacks the indicia of reliability based on the self-interest inherent in obtaining appropriate medical treatment; and (2) in light of the defense expert's reservations and the inconsistencies between defendant's statements, it cannot be said that this circumstance was supported by uncontroverted and manifestly credible evidence.

**30. Sentencing— mitigating circumstances—nonstatutory— alcohol abuse by mother and family members—failure to give peremptory instruction**

The trial court did not err in a capital first-degree murder sentencing proceeding by failing to peremptorily instruct on the nonstatutory mitigating circumstance that defendant's mother abused alcohol as did other family members, because in light of defendant's family ties with the witnesses and the lack of specific evidence as to defendant's contact with the drinking, it cannot be said that uncontroverted and manifestly credible evidence existed to support a peremptory charge as to this circumstance.

**31. Sentencing— mitigating circumstances—nonstatutory— defendant exposed to violence among family members as a child—failure to give peremptory instruction**

The trial court did not err in a capital first-degree murder sentencing proceeding by failing to peremptorily instruct on the nonstatutory mitigating circumstance that defendant was exposed to violence among family members as a child, because the family relationship between defendant and the witnesses and the uncertainties expressed in their testimony reveals that there was not the requisite manifest credibility to require a peremptory instruction on this circumstance.

**32. Sentencing— mitigating circumstances—nonstatutory— defendant witnessed mother returning home with men in drunken state—failure to give peremptory instruction**

The trial court did not err in a capital first-degree murder sentencing proceeding by failing to peremptorily instruct on the nonstatutory mitigating circumstance that as a child defendant witnessed his mother returning home with men in a drunken state, because: (1) the record contains no suggestion that defendant's mother would leave home to find these visitors or, having left home for whatever reason, would return with them; and (2) the instruction is ambiguous in that it could refer to the drunken state of either the mother or the various men.

**33. Criminal Law— prosecutor's argument—defendant's failure to call wife to testify**

Although the trial court erred in a capital first-degree murder sentencing proceeding by failing to give a detailed peremptory curative instruction after the prosecutor improperly commented about defendant's failure to call his wife to testify, the error was not prejudicial because: (1) although the trial court failed to sustain defendant's initial objection when the prosecutor strayed into improper territory, the trial court sustained defendant's renewed objection as soon as the prosecutor began to develop this theme and the trial court instructed the jury to disregard that argument; (2) evidence of defendant's guilt was strong and included a confession; and (3) defendant failed to establish under N.C.G.S. § 15A-1443 that a different verdict would have resulted if the trial court had sustained defendant's objection more promptly and given a properly detailed curative instruction.

**34. Sentencing— aggravating circumstances—pecuniary gain— jury instructions**

The trial court did not commit plain error in a capital first-degree murder sentencing proceeding by its instruction on the N.C.G.S. § 15A-2000(e)(6) pecuniary gain aggravating circumstance even though defendant contends it allowed the jury to find the aggravating circumstance without finding that the motive for the murder was pecuniary gain.

**35. Sentencing— capital—death penalty—no influence of passion or prejudice**

The trial court did not err in a first-degree murder case by sentencing defendant to the death penalty even though defendant

STATE v. BARDEN

[356 N.C. 316 (2002)]

contends it was imposed under the influence of passion or prejudice in violation of N.C.G.S. § 15A-2000(d)(2), because: (1) the prosecutor based his decision to seek the death penalty on the number of aggravating circumstances, the seriousness of the case, and the treatment of other similar cases; (2) there was no impropriety whatsoever in the trial judge's humane words of encouragement to a defendant who had just been told that he is going to die; and (3) the jury's failure to find twenty-five of the twenty-seven submitted mitigating circumstances did not demonstrate the jurors behaved irrationally.

**36. Sentencing— capital—death penalty proportionate**

The trial court did not err in a first-degree murder case by sentencing defendant to the death penalty, because: (1) the jury found three aggravating circumstances including the N.C.G.S. § 15A-2000(e)(3) prior crime of violence aggravator, the N.C.G.S. § 15A-2000(e)(6) pecuniary gain aggravator, and the N.C.G.S. § 15A-2000(e)(9) especially heinous, atrocious or cruel aggravator; (2) defendant bludgeoned the victim in the head numerous times, changed weapons during the course of the attack, and defendant acknowledged that the victim may have been alive after the attack but took no steps to assist the victim; (3) defendant instituted the attack only after the victim, who had already loaned defendant money once that night, refused to make a second loan of twenty dollars; and (4) defendant's attack began after the victim turned his back to defendant to resume his duties at work.

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of death entered by Balog, J., on 12 November 1999 in Superior Court, Sampson County, upon a jury verdict finding defendant guilty of first-degree murder. On 25 June 2001, the Supreme Court allowed defendant's motion to bypass the Court of Appeals as to an additional judgment. Heard in the Supreme Court 14 February 2002.

*Roy Cooper, Attorney General, by William N. Farrell, Jr., Senior Deputy Attorney General; John G. Barnwell, Assistant Attorney General; and Ellen Scouten, Special Deputy Attorney General, for the State.*

*Staples Hughes, Appellate Defender, by Daniel R. Pollitt, Assistant Appellate Defender, for defendant-appellant.*

**STATE v. BARDEN**

[356 N.C. 316 (2002)]

EDMUNDS, Justice.

Defendant was indicted for first-degree murder and robbery with a dangerous weapon. The trial began on 1 November 1999, and defendant was found guilty of first-degree murder under felony murder rule and guilty of robbery with a dangerous weapon. At defendant's capital sentencing proceeding, the jury found that the mitigating circumstances were insufficient to outweigh the aggravating circumstances and recommended a sentence of death. On 12 November 1999, the court entered judgment imposing a death sentence for the first-degree murder conviction while arresting judgment on the conviction for armed robbery.

Both defendant, Iziah Barden, and the victim, Felipe Resendiz, were employed by Master Casings, a business located in Clinton, North Carolina. Defendant was a machine operator, while the victim was a contract worker who cleaned the equipment in the evenings. The victim's responsibilities often required that he work until 1:00 or 2:00 a.m., and he would close the business when he left.

Friday, 27 March 1998, was a payday at Master Casings. Around 4:30 that afternoon, the victim cashed his paycheck at a bank, then began work at the plant at 6:00 p.m. He was still on the job when the plant janitor left the building at 10:30 p.m.

The next morning, two workers found the lifeless victim lying facedown in the plant. They observed obvious wounds to the back of his head and saw that his back pocket had been pulled inside out. Investigators found a stainless-steel paddle inside a bin near the body. A small amount of blood was on the paddle's blade. An autopsy revealed that the victim had been struck on the head fourteen times. The evidence indicated that the victim's assailant used different implements because some injuries were caused by an instrument with a sharp edge, while others were caused by an object with a round striking surface. The victim's skull had been exposed by the blows and was fractured in several places. The cause of death was determined to be severe blunt-force trauma to the head.

On 5 April 1998, defendant was questioned by Detective Edward McClain of the Clinton Police Department. Detective McClain went to Master Casings, where defendant was working, and asked to speak with him. The detective identified himself, explained that he was investigating the victim's death, and asked defendant to accompany him to the police station. He told defendant that he was not under arrest and did not have to come, but stated that he would appreciate

defendant's help. Defendant agreed and drove separately to the police station in his own vehicle. He went to the detective's office, where the detective reminded defendant that he was not under arrest and did not advise defendant of his rights pursuant to *Miranda v. Arizona*. Defendant made a statement that was not incriminating.

After defendant completed this statement, the detective noticed a substance that appeared to be blood on the sole of one of defendant's shoes. When the detective told defendant that there might be evidence on the shoe and asked if he could examine it, defendant consented and handed over both shoes. The detective seized the shoes after taking a closer look, and defendant was allowed to leave the police station wearing slippers provided by the police. Later analysis of the shoe revealed that the stain was indeed blood and that DNA from the blood matched DNA from the victim.

On 10 April 1998, the manager of a construction company conducted a predemolition inspection of a small building near the Master Casings plant. When he saw a bag that appeared to contain clothing and a billfold, he called the police. Responding officers found that the bag held bloody Master Casings uniform trousers with defendant's name on the waistband, a billfold containing the victim's driver's license, and a sledgehammer. DNA analysis established that the blood on the steel paddle at Master Casings, the blood on the uniform trousers, and the blood found on the sledgehammer all came from the victim.

On 16 April 1998, investigators from the North Carolina State Bureau of Investigation and the Clinton Police Department returned to Master Casings and asked to speak with defendant. As before, defendant was told he was not under arrest and was allowed to drive his own car to the office of the SBI agent. There, the investigators again informed defendant he was not under arrest and did not advise him of his *Miranda* rights.

Although defendant at first denied any involvement in the victim's death, upon further questioning he confessed. He told the investigators that on 27 March 1998 he had been smoking crack cocaine at a house near Master Casings. He knew the victim would be working late, so around 11:00 p.m., he went to the plant to borrow money from the victim. The victim loaned him $20.00, which he used to purchase additional crack cocaine. After smoking that crack, defendant remained unsatisfied, so around 1:00 a.m. on 28 March 1998, he returned to Master Casings to borrow more money from the victim.

**STATE v. BARDEN**

[356 N.C. 316 (2002)]

According to defendant, when he made the request, the victim responded with some words in Spanish that he did not understand, followed by the word "black." Defendant assumed that the victim had insulted him, but before he could react, the victim slapped him on his left cheek. Defendant said that he then was suffering from a toothache, so the slap had been particularly painful.

As the victim returned to his work, defendant said he saw a small sledgehammer on top of a machine. He picked it up and approached the victim from behind. Defendant said he struck the victim on the back of the head with the hammer three or four times. Defendant said the victim appeared to be trying to reach something, which he thought might be a weapon, in his front pocket. The victim fell, and defendant continued to hit him on the head with the hammer. The victim was still moving slightly and mumbling as defendant removed the victim's wallet from his back pocket. Defendant said he changed his trousers because they were bloody and took $180.00 from the victim's wallet. He put his pants, the now-empty wallet, and the sledgehammer in a bag that he left near some railroad tracks. After defendant completed this statement, the investigators allowed him to depart. He was arrested approximately two hours later.

## PRETRIAL ISSUES

Defendant raises two issues pertaining to the pretrial proceedings in his case. First, defendant argues that the trial court erred in denying his motion to suppress evidence of statements he made to police on 5 April 1998 and 16 April 1998 and in allowing the subsequent admission of those statements into evidence at trial. Second, defendant contends the trial court improperly admitted evidence derived from the pair of shoes seized from him on 5 April 1998. We address these arguments *seriatim*.

In his motion to suppress the statements, defendant argued they were inadmissible because he was not given *Miranda* warnings prior to the allegedly custodial interrogations during which he made the statements. *See Miranda v. Arizona*, 384 U.S. 436, 444-45, 16 L. Ed. 2d 694, 706-07 (1966). In addition, defendant argued that the statements were involuntary and taken in violation of his federal and state constitutional rights. The trial court held a pretrial hearing on the motion to suppress on 21 October 1999. After hearing evidence, the trial court concluded that the statements were voluntarily given by defendant at a time when he was not in custody, and denied the motion.

On appeal, defendant again raises these issues as to his statements. In addition, defendant contends the admission of these statements was plain error.

We note at the outset that defendant did not object at trial to the introduction of evidence regarding either the 5 April 1998 statement or the 16 April 1998 statement, nor did he object to evidence derived from his shoes. We have previously held that a pretrial motion to suppress evidence is not sufficient to preserve for appellate review the issue of whether the evidence was properly admitted if the defendant fails to object at the time the evidence is introduced at trial. *State v. Golphin*, 352 N.C. 364, 405, 533 S.E.2d 168, 198-99 (2000), *cert. denied*, 532 U.S. 931, 149 L. Ed. 2d 305 (2001); *State v. Hayes*, 350 N.C. 79, 80, 511 S.E.2d 302, 303 (1999) (per curiam). Nevertheless, because these issues raise important constitutional questions in the context of a capital case, we will address defendant's contentions pursuant to Rule 2 of the North Carolina Rules of Appellate Procedure.

**[1]** We first consider whether the trial court erred in denying defendant's motion to suppress his statements. Defendant contends that he gave each statement during a custodial interrogation, without notice of his *Miranda* rights. The applicable standard in reviewing a trial court's determination on a motion to suppress is that the trial court's findings of fact "are conclusive on appeal if supported by competent evidence, even if the evidence is conflicting." *State v. Eason*, 336 N.C. 730, 745, 445 S.E.2d 917, 926 (1994), *cert. denied*, 513 U.S. 1096, 130 L. Ed. 2d 661 (1995). Any conclusions of law reached by the trial court in determining whether defendant was in custody "must be legally correct, reflecting a correct application of applicable legal principles to the facts found." *State v. Fernandez*, 346 N.C. 1, 11, 484 S.E.2d 350, 357 (1997).

At the 21 October 1999 suppression hearing, the trial court made the following pertinent findings of fact:

3. That during the investigation, Detective McClain received information that the defendant was possibly involved in the homicide.

4. That as a result, on April 5, 1998, Detective McClain went to the defendant's place of work, the Master Casing factory, to attempt to interview the defendant.

5. That at Master Casing, Detective McClain asked to speak with the defendant and the defendant's employer summoned him to the front office.

6. That in the office, Detective McClain identified himself to the defendant as a Clinton Police Officer and that he was investigating the death of Felipe Resendiz.

7. That Detective McClain asked the defendant to accompany him to the Clinton Police Department.

8. [That] Detective McClain advised the defendant that he was not under arrest, that the Detective would appreciate his help, and the defendant did not have to come with him.

9. That the defendant did agree to accompany Detective McClain to the Clinton Police Department for an interview.

10. That Detective McClain left in his vehicle first and the defendant followed in his own vehicle.

11. That Detective McClain and the defendant went to Detective McClain's office at the Clinton Police Department and sat down in the office with the door open.

12. That Detective McClain again advised the defendant that he was investigating the death of Felipe Resendiz and he believed the defendant had information about that matter and the detective would appreciate the defendant giving him that information.

13. That [McClain] advised the defendant again that he was not under arrest, that he was free to leave at any time.

14. That the defendant was with Detective McClain on this occasion no more than one hour and did give a statement, however, it was not incriminating.

15. That the defendant did not receive any Miranda warnings during this interview process.

16. That the Court finds as a fact that [defendant] was not in custody and that a reasonable person in [defendant's] circumstances would believe that he was <u>not</u> in custody and was free to go.

17. That after the statement of the defendant was obtained, . . . he was allowed to go to the bathroom unaccompanied, after

**STATE v. BARDEN**

[356 N.C. 316 (2002)]

which, he came back to Detective McClain's office on his own.

18. That Detective McClain observed what he believed to be blood on the outside of the sole of the defendant's shoes.

19. That Detective McClain asked the defendant if he could look at the defendant's shoes, telling the defendant that he suspected that there was evidence on his shoes.

20. That the defendant consented to allowing the officer to look at his shoes and took off his shoes and gave them to Detective McClain.

21. That Detective McClain and Special Agent Jay Tilley of the State Bureau of Investigation, who had joined Detective McClain after the statement was obtained, examined the shoes, and saw what appeared to them to be blood.

22. [That] Detective McClain then seized the shoes for submission to the laboratory for blood and DNA analysis.

23. That the defendant was then released and allowed to leave following the interview.

24. That there were no promises or threats or any type of inducement directed to the defendant by Detective McClain or Agent Tilley.

25. That Detective McClain next had contact with the defendant on April 6, 1998 when the defendant consented to giving Detective McClain a blood sample and fingerprints and allowed himself to be photographed.

26. That Detective McClain next had contact with the defendant on April 16, 1998 at about 2:00 p.m. when Detective McClain and Special Agent John Thomas Keane of the State Bureau of Investigation went to the defendant's place of employment at Master Casings to attempt to interview him again.

27. That on this occasion, they went to the office and asked the supervisors if they could interview or speak to the defendant, and the defendant was again summoned to the supervisor's office.

28. That Detective McClain introduced [S]pecial Agent Keane to the defendant.

29. That the officers asked the defendant if he minded speaking with them about the matter of the death of Felipe Resendiz away from the premises of Master Casings.

30. That the officers again advised the defendant that he was not under arrest and that if he accompanied them for an interview that he could leave any time that he wanted to do so and the defendant stated that he understood.

31. That the defendant asked again to drive himself rather than being driven by the officers and he was allowed to do so.

32. That he followed the officers to the State Bureau of Investigation resident agent's office located on the second floor of the Sampson County Courthouse Annex building.

33. That at the courthouse annex, the defendant followed the officers into the building and they went to the resident agent's office.

34. That Special Agent Keane and Detective McClain interviewed the defendant in that office with the door closed, both for privacy of their interview and to lessen noise from outside the office.

35. That the officers again advised the defendant that he was not under arrest and that he could leave any time that he desired to go back to work or elsewhere and they did nothing to detain him and the defendant again indicated that he understood.

36. That the defendant was not in custody and no reasonable person would have believed under the circumstances that he was not free to go.

37. That the officers did not advise the defendant of his Miranda rights.

38. That during the interview, the officers provided the defendant with a soft drink, as they had indicated to him at the beginning of the interview they would if he desired, and he was also provided cigarettes as requested.

39. That the defendant at first denied his involvement in the homicide of Felipe Resendiz and later admitted that he was involved and did commit this homicide.

40. That the officers had advised the defendant that they believed that he was not telling the truth when he denied his involvement and told him that he needed to be truthful, that this was his opportunity to be truthful; made references to the defendant having been in the Army and that that was a respectable position and that he should be respectable and truthful now in making his statement.

41. That the officers also, prior to his admission, advised the defendant that there was evidence and interviews that pointed to him being responsible for the homicide. The officers also told the defendant that he would feel better about himself if he told the truth.

42. That during this interview, the defendant was in control of his mental and physical faculties.

43. That his answers were responsive to the officers' questions and he was cooperative and calm and not under the influence of any impairing substance.

44. That after being encouraged by the officers to tell the truth about what had occurred, the defendant did become tearful and did confess to his involvement in the homicide of Felipe Resendiz.

45. That after his confession, the defendant asked to go to the bathroom and was allowed to do so. Detective McClain showed the defendant where the restroom was, and then Detective McClain left the defendant alone at the bathroom and returned to the office where the interview was being conducted . . . . The defendant came back to the office some three to four minutes later.

46. That this interview lasted approximately one hour.

47. That the officers informed the defendant that he was free to leave, and he was at first hesitant to leave, still being upset from having confessed to his involvement in the homicide, but did soon leave in his own automobile by himself after calling his employer to advise that he would not be back to work.

48. That the defendant had informed the officers that he wanted to go home, and they told him that he was free to go there or anywhere else.

49. That there were no promises, threats or inducements of any kind to the defendant to induce him to make a statement.

Based on these findings of fact, the trial court made the following conclusions of law:

1. That on April 6 [sic], 1998, the defendant voluntarily and consensually gave his shoes to Detective McClain. And that Detective McClain, after examining them, had probable cause to seize them. Under the circumstances, he could not return them to the defendant to obtain a search warrant since they could easily have been destroyed or disposed of by the defendant.

2. That on April 5, 1998, the defendant voluntarily gave a statement to Detective McClain when the defendant was not in custody.

3. That on April 16, 1998, the defendant voluntarily gave a statement to Detective McClain and Special Agent Keane at a time when the defendant was not in custody.

Both the United States Supreme Court and this Court have held that *Miranda* applies only in the situation where a defendant is subject to custodial interrogation. *Miranda v. Arizona*, 384 U.S. at 444, 16 L. Ed. 2d at 706; *State v. Gaines*, 345 N.C. 647, 661, 483 S.E.2d 396, 404, *cert. denied*, 522 U.S. 900, 139 L. Ed. 2d 177 (1997); *State v. Phipps*, 331 N.C. 427, 441-42, 418 S.E.2d 178, 185 (1992). The proper inquiry for determining whether a person is "in custody" for purposes of *Miranda* is "based on the totality of the circumstances, whether there was a 'formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.' " *State v. Buchanan*, 353 N.C. 332, 339, 543 S.E.2d 823, 828 (2001). In this case, we must examine "whether a reasonable person in defendant's position, under the totality of the circumstances, would have believed that he was under arrest or was restrained in his movement to the degree associated with a formal arrest." *Id.* at 339-40, 543 S.E.2d at 828; *see also Thompson v. Keohane*, 516 U.S. 99, 112, 133 L. Ed. 2d 383, 394 (1995).

The record shows that for both interviews, defendant voluntarily drove his own car to meet with police for questioning. Defendant was repeatedly informed both before he agreed to talk with the investigators and after he arrived for questioning that he was not under arrest and was free to leave at any time. At no point during the interaction

STATE v. BARDEN

[356 N.C. 316 (2002)]

between defendant and the police was defendant ever restrained or confined to the degree associated with a formal arrest. At the conclusion of each interview, defendant was allowed to go. As the United States Supreme Court has stated:

> Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime. But police officers are not required to administer *Miranda* warnings to everyone whom they question. Nor is the requirement of warnings to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect.

*Oregon v. Mathiason*, 429 U.S. 492, 495, 50 L. Ed. 2d 714, 719 (1977); *see also State v. Gaines*, 345 N.C. at 662, 483 S.E.2d at 405. Although defendant cites an instance where the door to one of the interview rooms was closed, no single factor is necessarily controlling when we consider the totality of the circumstances. *See, e.g., State v. Bone*, 354 N.C. 1, 11, 550 S.E.2d 482, 489 (2001) ("[W]e have noted that an individual's voluntary agreement to accompany law enforcement officers to a place customarily used for interrogation does not constitute an arrest."), *cert. denied*, 535 U.S. 940, 152 L. Ed. 2d 231 (2002); *State v. Daughtry*, 340 N.C. 488, 504-07, 459 S.E.2d 747, 754-56 (1995) (the defendant held not to be in custody when the defendant agreed to accompany the police to the station for questioning; was told that he was not under arrest and could leave at any time; was not handcuffed or restrained; and was questioned at the police station by officers, who at one point closed the door for privacy), *cert. denied*, 516 U.S. 1079, 133 L. Ed. 2d 739 (1996); *State v. Medlin*, 333 N.C. 280, 291, 426 S.E.2d 402, 407 (1993) (the defendant held not to be in custody when he was escorted to police station bathroom, was told he could leave at any time, and was in presence of officers at all times); *State v. Phipps*, 331 N.C. at 442-45, 418 S.E.2d at 185-87 (the defendant held not to be in custody where he voluntarily went to the station to talk with investigators when asked by the police, was not arrested, was allowed to return home, and later agreed to take a polygraph examination). We hold that, based upon the totality of the circumstances, a reasonable person in defendant's position would not have believed that he was under arrest or that he was restrained to a degree that would cause him to believe he was formally arrested. We agree with the trial court's findings of fact and conclusions of law that defendant

was not "in custody" when he made statements on 5 April and 16 April 1998, and therefore, the police were not required to give *Miranda* warnings.

**[2]** We next consider whether the trial court erred in denying defendant's motion to suppress his statements based upon defendant's contention that they were not voluntary. Defendant argues that circumstances of the 5 April 1998 and 16 April 1998 interrogations, viewed either together or separately, had a coercive impact on defendant that rendered his statements involuntary.

A statement is admissible if it "was given voluntarily and understandingly." *State v. Schneider*, 306 N.C. 351, 355, 293 S.E.2d 157, 160 (1982). The determination of whether defendant's statements are voluntary "is a question of law and is fully reviewable on appeal." *State v. Greene*, 332 N.C. 565, 580, 422 S.E.2d 730, 738 (1992). The appropriate test is one "in which the court looks at the totality of the circumstances of the case in determining whether the confession was voluntary." *State v. Jackson*, 308 N.C. 549, 581, 304 S.E.2d 134, 152 (1983). Factors that are considered include

whether defendant was in custody, whether he was deceived, whether his Miranda rights were honored, whether he was held incommunicado, the length of the interrogation, whether there were physical threats or shows of violence, whether promises were made to obtain the confession, the familiarity of the declarant with the criminal justice system, and the mental condition of the declarant.

*State v. Hardy*, 339 N.C. 207, 222, 451 S.E.2d 600, 608 (1994).

Applying the above factors to the instant case, we agree with the trial court's conclusion of law that defendant's statements were voluntary. Although there is no need to cite again the evidence discussed above, we note that additional factors from the record support the trial court's findings. During one of the interviews, defendant was offered drinks and cigarettes. He was allowed to use the rest room without being escorted by an officer. At no point during either session was defendant restrained or handcuffed. Neither interview was prolonged. The record is devoid of any suggestion of physical threats to or pressure exerted on defendant to obtain a statement. Therefore, we hold that, based upon the totality of the circumstances, defendant gave the statements voluntarily. In light of this holding, we also hold

that the trial court did not commit plain error by admitting defendant's statements.

[3] Next, defendant argues that the trial court erred when it denied his pretrial motion to suppress evidence derived from his shoes, which were obtained by police during the 5 April 1998 interview. Defendant contends the evidence was inadmissible because it constituted a warrantless seizure of his property unsupported by either probable cause or exigent circumstances. Although defendant did not object to the introduction of this evidence at trial, as with defendant's statements, we will address defendant's constitutional arguments pursuant to Rule 2 of the North Carolina Rules of Appellate Procedure.

The record reveals that during the interrogation, Detective McClain observed what he believed to be blood on the outside sole of defendant's right shoe. When Detective McClain asked defendant if he could look at his shoes, defendant replied "sure" and gave them to the detective. Detective McClain packaged the shoes for crime analysis and explained to defendant "[t]hat there was possibly blood on [defendant's] shoes and [that he] wanted to either prove or disprove either [defendant's] involvement or . . . not . . . in this matter." Detective McClain gave defendant a pair of slippers to wear home.

At the conclusion of the suppression hearing, the trial court made the extensive findings of fact and conclusions of law quoted above and denied defendant's motion to suppress. Our review of a denial of a motion to suppress by the trial court is "limited to determining whether the trial judge's underlying findings of fact are supported by competent evidence, in which event they are conclusively binding on appeal, and whether those factual findings in turn support the judge's ultimate conclusions of law." *State v. Cooke*, 306 N.C. 132, 134, 291 S.E.2d 618, 619 (1982).

After a careful review of the record, we hold that the trial court's conclusions of law were correct. As a general rule, " '[a] governmental search and seizure of property unaccompanied by prior judicial approval in the form of a warrant is per se unreasonable unless the search falls within a well-delineated exception to the warrant requirement.' " *State v. Hardy*, 339 N.C. at 226, 451 S.E.2d at 610 (quoting *State v. Cooke*, 306 N.C. at 135, 291 S.E.2d at 620).

Consent, however, has long been recognized as a special situation excepted from the warrant requirement, and a search is not

unreasonable within the meaning of the Fourth Amendment when lawful consent to the search is given. *Schneckloth v. Bustamonte*, 412 U.S. 218, 36 L. Ed. 2d 854 (1973). For the warrantless, consensual search to pass muster under the Fourth Amendment, consent must be given and the consent must be voluntary. *Id.* at 222, 36 L. Ed. 2d at 860. Whether the consent is voluntary is to be determined from the totality of the circumstances. *Id.* at 227, 36 L. Ed. 2d at 863.

*State v. Smith*, 346 N.C. 794, 798, 488 S.E.2d 210, 213 (1997).

In this case, the totality of the circumstances fully supports the trial court's conclusion that defendant voluntarily gave his shoes to the police. Defendant was neither placed in a coercive environment where he surrendered the shoes to the officers involuntarily nor subjected to duress to the point that defendant felt he had no other meaningful choice. As we have held above, a reasonable person in defendant's position would not have believed that he was under arrest. Just as defendant voluntarily drove to the interview sites and gave statements concerning the murder, he voluntarily gave up his shoes without compulsion or coercion.

Although the State cites our decision in *State v. Bone*, 354 N.C. at 8-9, 550 S.E.2d at 487, that case is distinguishable from the case at bar despite a number of factual similarities. In *Bone*, this Court held that the trial court properly allowed evidence of shoes seized from the defendant based upon the theories of plain view coupled with exigent circumstances and of search incident to a lawful arrest. *Id.* When asked to give his shoes to the police, the defendant in *Bone* refused and surrendered them only after a search warrant was issued. *Id.* at 7, 550 S.E.2d at 486. In *Bone*, we determined that the defendant suffered a " 'restraint on freedom of movement of the degree associated with a formal arrest,' " such that defendant was effectively placed under arrest at the moment his shoes were taken from him. *Id.* at 12, 550 S.E.2d at 489 (quoting *State v. Gaines*, 345 N.C. at 662, 483 S.E.2d at 405). By contrast, defendant here voluntarily provided his shoes to the officers for inspection. Moreover, the retention of his shoes did not immobilize defendant because investigators gave defendant a pair of slippers to wear home. We hold the seizure of defendant's shoes was proper because defendant voluntarily consented to the seizure, not as a result of coercion or arrest. This assignment of error is overruled.

## JURY SELECTION

**[4]** We next address issues raised by defendant pertaining to jury selection. Defendant argues that the trial court erred when it held that he had not made a *prima facie* showing of racial discrimination at the time he objected to the prosecutor's peremptory challenges to prospective jurors Baggett and Corbett. The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and Article I, Section 26 of the Constitution of North Carolina forbid the use of peremptory challenges for a racially discriminatory purpose. *Batson v. Kentucky*, 476 U.S. 79, 89, 90 L. Ed. 2d 69, 83 (1986); *State v. Golphin*, 352 N.C. at 425, 533 S.E.2d at 210. In *Batson*, the United States Supreme Court set out a three-part test to determine whether a prosecutor impermissibly used peremptory challenges to excuse prospective jurors on the basis of race, *see Hernandez v. New York*, 500 U.S. 352, 358-59, 114 L. Ed. 2d 395, 405 (1991) (citing *Batson v. Kentucky*, 476 U.S. at 96-98, 90 L. Ed. 2d at 87-89), and we have adopted this test, *State v. Lawrence*, 352 N.C. 1, 13-14, 530 S.E.2d 807, 815-16 (2000), *cert. denied*, 531 U.S. 1083, 148 L. Ed. 2d 684 (2001). First, the defendant must make a *prima facie* showing that the prosecutor exercised a peremptory challenge on the basis of race. *Hernandez v. New York*, 500 U.S. at 358, 114 L. Ed. 2d at 405. If such a showing is made, the prosecutor is required to offer a facially valid and race-neutral rationale for the peremptory challenge or challenges. *Id.* at 358-59, 114 L. Ed. 2d at 405. Finally, the trial court must decide whether the defendant has proven purposeful discrimination. *Id.* at 359, 114 L. Ed. 2d at 405.

In the case at bar, we are concerned only with the first prong of this test. The record reveals that the court used a rolling system of jury selection. Twelve prospective jurors were seated in the jury box and questioned about their fitness to serve. As individuals among the original twelve were challenged for cause, replacements were immediately brought forward and questioned along with those remaining from the original panel. Once twelve prospective jurors were seated who had not been challenged for cause or had survived such challenges, the prosecutor was allowed to conduct *voir dire* of these twelve and exercise peremptory challenges. Thereafter, defendant was permitted to question the remaining prospective jurors and exercise his peremptory challenges.

Defendant raised a *Batson* objection when the prosecutor peremptorily excused prospective jurors Baggett and Corbett. Those individuals were the thirty-eighth and thirty-ninth prospective jurors

called forward. At that point, twelve prospective jurors had already been excused for cause by the court. The prosecutor had so far peremptorily excused five prospective jurors: one white male, one African-American male, two African-American females, and one Native American male. Prospective jurors Baggett and Corbett were African-Americans, and when the prosecutor peremptorily excused both of them, defendant raised a *Batson* objection. Although the prosecutor argued to the court that he did not believe that defendant had established a *prima facie* case of discrimination, he stated that he was prepared to explain his reasons for each peremptory challenge. The court declined the offer of explanations, ruling: "I do find there . . . has not been any prima faci[e] showing of racial discrimination of the selection of the jurors, and the State will not be required to state reasons for prior peremptories used or these peremptories used. . . . But I don't feel there's any pattern thus far." Prospective jurors Baggett and Corbett were excused, and jury selection continued.

> Where the trial court rules that a defendant has failed to make a *prima facie* showing, our review is limited to whether the trial court erred in finding that defendant failed to make a *prima facie* showing, even if the State offers reasons for its exercise of the peremptory challenges.

*State v. Smith*, 351 N.C. 251, 262, 524 S.E.2d 28, 37, *cert. denied*, 531 U.S. 862, 148 L. Ed. 2d 100 (2000). In *State v. Quick*, 341 N.C. 141, 145, 462 S.E.2d 186, 189 (1995), this Court set out various factors to consider in analyzing the jury selection process where a *Batson* challenge is raised, including the races of the victim and the defendant, repeated use of peremptory challenges against minorities tending to establish a pattern of strikes against that minority in the venire, the acceptance rate of prospective minority jurors by the party exercising the questioned peremptory challenges, and so forth. Although the *Quick* factors are not exhaustive, they do provide guidance in the case at bar.

Defendant is African-American, and the victim was Hispanic. Other than the alleged racial motive for the exercise of his peremptory challenges that we are now scrutinizing, nothing in the record demonstrates or even suggests that the prosecutor expressed or showed any prejudice against minorities. Although he asked prospective jurors whether the victim's Hispanic origin would be a factor in their deliberation, we perceive no hint of racism in questions of this type. Instead, it appears the questions were asked to reveal any racial

STATE v. BARDEN

[356 N.C. 316 (2002)]

prejudices held by prospective jurors. In analyzing the prosecutor's peremptory challenges in the context of this case and this jury, we observe that at the point defendant raised his *Batson* claim, the prosecutor had already peremptorily excused five of seven eligible African-American prospective jurors (including prospective jurors Baggett and Corbett) and one Native American prospective juror. Thus, the prosecutor accepted only 28.6% of the eligible African-American prospective jurors. If the Native American prospective juror peremptorily excused by the prosecutor is also considered a minority for the purposes of this analysis, the acceptance rate of minorities is even lower. By contrast, the prosecutor peremptorily challenged only one white prospective juror out of twenty who were eligible to serve on the jury, for an acceptance rate of whites of 95%. Viewed from another perspective, at the time of defendant's *Batson* objection, the prosecutor had expended 14.3% of his peremptory challenges against a white prospective juror, 14.3% of his peremptory challenges against a Native American prospective juror, and 71.4% of his peremptory challenges against African-American prospective jurors. On the other hand, the prosecutor accepted two prospective African-American jurors even though he had available peremptory challenges.

We emphasize that a numerical analysis of the type employed here is not necessarily dispositive. However, such an analysis can be useful in helping us and the trial court determine whether a *prima facie* case of discrimination has been established. *State v. Fletcher*, 348 N.C. 292, 320, 500 S.E.2d 668, 684 (1998), *cert. denied*, 525 U.S. 1180, 143 L. Ed. 2d 113 (1999). Employing such an analysis, we have held that a defendant failed to establish a *prima facie* case of discrimination where the minority acceptance rate was 66%, *State v. Ross*, 338 N.C. 280, 285-86, 449 S.E.2d 556, 561-62 (1994); 50%, *State v. Nicholson*, 355 N.C. 1, 24, 558 S.E.2d 109, 127, *cert. denied*, —— U.S. ——, 154 L. Ed. 2d 71 (2002); *State v. Belton*, 318 N.C. 141, 159-60, 347 S.E.2d 755, 766 (1986), *overruled on other grounds by State v. Gaines*, 345 N.C. 647, 483 S.E.2d 396; 40%, *State v. Fletcher*, 348 N.C. at 320, 500 S.E.2d at 684; *State v. Abbott*, 320 N.C. 475, 481-82, 358 S.E.2d 365, 369-70 (1987); and 37.5%, *State v. Gregory*, 340 N.C. 365, 398, 459 S.E.2d 638, 657 (1995), *cert. denied*, 517 U.S. 1108, 134 L. Ed. 2d 478 (1996).

We are aware that we risk splitting hairs unduly if we attempt to distinguish between the 37.5% acceptance rate of prospective minority jurors in *Gregory* and the 28.6% rate here. However, we have also

held that "[s]tep one of the *Batson* analysis . . . is not intended to be a high hurdle for defendants to cross. Rather, the showing need only be sufficient to shift the burden to the State to articulate race-neutral reasons for its peremptory challenge." *State v. Hoffman*, 348 N.C. 548, 553, 500 S.E.2d 718, 722 (1998). Here, although we acknowledge that the issue is a close one, we hold that the trial court's conclusion that defendant failed to present a *prima facie* showing sufficient to satisfy the first prong of a *Batson* challenge was error. In so holding, we do not suggest that any improprieties actually took place during the jury selection. That determination is to be made upon remand, as detailed below. We note that the trial court demonstrated its sensitivity to the requirements of *Batson* when defendant made a second such objection later during the jury selection. The trial court then found that defendant had met his *prima facie* burden and required the prosecutor to explain his peremptory challenges.

Although we find no other potentially prejudicial error in defendant's trial, we remand this case to Superior Court, Sampson County, for the limited purpose of holding a hearing pursuant to *Batson*. On remand, a judge presiding over a criminal session shall give the State an opportunity for presenting race-neutral reasons for striking prospective jurors Baggett and Corbett. If the trial court finds that the prosecutor's explanations are not race-neutral, it shall order a new trial. If the trial court finds that the prosecutor's explanations are race-neutral, defendant shall be given the opportunity to demonstrate that the explanations are pretextual. If defendant is able to meet his burden of proving intentional discrimination, the trial court shall order a new trial, but if defendant does not meet this burden, the trial court shall make appropriate findings of fact and conclusions of law and order commitment to issue in accordance with the judgment entered 12 November 1999. *State v. McCord*, 140 N.C. App. 634, 654, 538 S.E.2d 633, 645-46 (2000), *disc. rev. denied*, 353 N.C. 392, 547 S.E.2d 33, *and disc. rev. denied*, 353 N.C. 392, 547 S.E.2d 34 (2001).

[5] Defendant raises several other issues related to jury selection. Defendant cites eight specific instances during jury selection that he claims are improper comments by the prosecutor on defendant's right not to testify. Defendant additionally argues that four other errors occurred during jury selection: (1) the prosecution improperly asked prospective jurors whether they believed the death penalty is a necessary law, (2) the prosecution improperly injected into jury selection the issue of the victim's race, (3) the prosecution attempted

to establish rapport with prospective jurors, and (4) the prosecution made incomplete and misleading statements concerning the sentencing phase during jury selection.

Defendant did not raise a timely objection to any of these statements. This Court has "declin[ed] to extend application of the plain error doctrine to situations where a party has failed to object to statements made by the other party during jury *voir dire*." *State v. Cummings*, 352 N.C. 600, 613, 536 S.E.2d 36, 47 (2000), *cert. denied*, 532 U.S. 997, 149 L. Ed. 2d 641 (2001). Therefore, we hold that defendant has failed to properly preserve these issues for review by this Court. *See* N.C. R. App. P. 10(b)(1).

[6] Defendant also raises one argument pertaining to the prosecutor's opening statement. Defendant claims the prosecution improperly injected race into the trial when, in the first sentence of his opening argument, the prosecutor stated: "Felipe Resendiz, a Hispanic man who moved here from Mexico, left the job . . . ." Defendant argues that the prosecutor improperly used the victim's race to urge the jury to convict defendant and to pressure the jury to prove that it was not prejudiced against the Hispanic community. Because defendant failed to object to the argument, we must determine "whether 'the remarks were so grossly improper that the trial court abused its discretion by failing to intervene *ex mero motu*.' " *State v. Anthony*, 354 N.C. 372, 423, 555 S.E.2d 557, 590 (2001) (quoting *State v. Mitchell*, 353 N.C. 309, 324, 543 S.E.2d 830, 839, *cert. denied*, 534 U.S. 1000, 151 L. Ed. 2d 389 (2001)), *cert. denied*, —— U.S. ——, 153 L. Ed. 2d 791 (2002). Our review of the record indicates that the statement was but a passing reference to the victim's ethnic background in a substantial opening argument. We are unable to say that the reference to the victim's race was improper at all, let alone so grossly improper that the trial court abused its discretion in failing to intervene.

These assignments of error are overruled.

## GUILT-INNOCENCE PHASE

[7] Defendant contends that the trial court erred when it admitted during the guilt-innocence phase of the trial the prosecution's evidence and argument pertaining to the victim's character and to victim impact. Defendant identifies three instances where he claims the trial court allowed irrelevant and inadmissible evidence. We discuss each incident separately.

STATE v. BARDEN

[356 N.C. 316 (2002)]

The first instance concerned the testimony of the victim's supervisor, Billy Jacobs. At trial, Jacobs gave the following pertinent testimony:

Q. Can you tell the jurors how you knew [the victim]?

A. [The victim], he worked for me in the Plant for probably eight or nine months when he came back. He worked there before. He would go to Mexico and come back. And he was such a good worker, we'd hire him back. So, he was working in the Plant on the machines to start with and we had—we started contracting the cleaning processes of it because the inspectors was [sic] so bad on us that nobody—if I just hired people by the hour, it weren't sufficient cleaning. So—

. . . .

Q. And did [the victim] ask to do this job?

A. Yes, sir.

Q. Why did you allow [the victim] to have this job?

A. Well, he said he would love to try it and [the victim] was a real responsible working guy and I really had a lot of confidence in him that he could do it because a lot of times when the guys would not clean up good at nights, I would get [the victim], his brothers and we would all get together and they—we would all get together and clean it up and they did a real good job.

. . . .

Q. All right. Mr. Jacobs, did—how would you describe work he did once he started doing the contract work cleaning up the Master Casing[s] Plant?

A. He did exactly what I thought he would do. He did an excellent job. I mean he had little write-ups. I mean, we'd have little minor stuff, but it [was] no real big stuff. We was [sic] really proud of the performance he was doing.

. . . .

Q. Now, prior to you leaving, did you have a talk with [the victim] in reference to—was he renting some equipment from you?

**STATE v. BARDEN**

[356 N.C. 316 (2002)]

A. Yes, sir. I have a high pressure sprayer and he was renting that from me by the week and when he came in that Friday to start to work, he always paid me a hundred dollars a week for the rent of[] the machine.

Q. And did he pay you a hundred dollars on this occasion?

A. Yes, sir.

Q. How did he pay you?

A. Well, he reached in his back pocket and pulled out his wallet and he handed me a $100 bill.

. . . .

Q. Did he—what did he do with the wallet after he paid you?

A. He put it back in his back pocket.

Q. Mr. Jacobs, did you see any other money or were you able to see the contents of his wallet?

A. No, sir.

Q. So you don't know—

A. Not where I was sitting from him. . . . I never had to ask him for it, he would always just—on Fridays, we would give him his check and he would go to the bank and most of the time he'd meet me there before we left.

Defendant argues that this testimony was irrelevant and improperly admitted as evidence of the victim's good character.

Because defendant did not object to any portion of the above testimony, we review this issue for plain error. *See* N.C. R. App. P. 10(c)(4). Plain error is applied only in extraordinary cases where, " 'after reviewing the entire record, it can be said the claimed error is a "*fundamental* error, something so basic, so prejudicial, so lacking in its elements that justice cannot have been done." ' " *State v. Odom*, 307 N.C. 655, 660, 300 S.E.2d 375, 378 (1983) (quoting *United States v. McCaskill*, 676 F.2d 995, 1002 (4th Cir.) (footnote omitted), *cert. denied*, 459 U.S. 1018, 74 L. Ed. 2d 513 (1982)).

Evidence is relevant if it demonstrates "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.C.G.S. § 8C-1, Rule 401 (2001). This Court has stated

that "in a criminal case every circumstance calculated to throw any light upon the supposed crime is admissible and permissible." *State v. Collins*, 335 N.C. 729, 735, 440 S.E.2d 559, 562 (1994).

In this case, our examination of the record reveals the testimony was relevant to explain the particular circumstances of the crime. The evidence explained the victim's various duties and responsibilities and showed why he worked late nights. In addition to describing the victim's work habits, the testimony was relevant to describe the victim's payday routine as well as where and how he kept his money. Therefore, we hold the evidence was properly admitted. *See State v. Davis*, 349 N.C. 1, 24-26, 506 S.E.2d 455, 468 (1998) ("prosecution was properly permitted to present evidence of [victim's] temperament and management style in order to prove the circumstances of the crime"), *cert. denied*, 526 U.S. 1161, 144 L. Ed. 2d 219 (1999).

[8] The next instance about which defendant complains involves the testimony of the victim's brother:

Q. [Were] you familiar with [the victim] having a wallet?

A. Yes.

Q. And did you see that wallet on Friday, the 27th of March?

A. Yes.

Q. What did he keep in his wallet other than his money?

A. He had his license and some other identification.

Q. Is [the victim] married?

A. Yes.

Q. Is his wife—where was his wife back in March of 1998?

A. She was in Mexico.

Q. Do you know if [the victim] sent any money to his wife during this time?

A. Yes. He did send it.

Q. Do they have any children?

A. Yes; a girl.

Q. How old is the girl?

A. She's going to be seven years.

Q. Is his wife out here in the audience? Do you see his wife?

A. Yes.

Q. Can you point her out to the Court?

A. It's the girl over there with the green sweater.

. . . .

[PROSECUTOR]: I show you State's Exhibit No. 17 and ask if you can look at that and if you can identify the person in that photo?

INTERPRETER: It is my brother.

Q. Is that Felipe Resendiz?

A. It is Felipe, my brother.

. . . .

Q. And approximately how long before his death did he get that picture taken?

A. It was about three months.

As above, because defendant did not object to the testimony at trial, we review the testimony for plain error. *See* N.C. R. App. P. 10(c)(4). This testimony, along with the testimony of Jacobs concerning the victim's wallet, is relevant to explain the victim's habits in handling his salary. The testimony of the witness both describes the victim carrying in his wallet the money received after cashing his paycheck and explains the reasons the victim needed cash. Consequently, the trial court properly allowed this evidence to be introduced at trial. Further, there was no error in the prosecution's asking the witness to identify the victim's wife and daughter at trial. The mere identification of the victim's wife and child does not constitute improper victim-impact evidence. *State v. Nobles*, 350 N.C. 483, 499-500, 515 S.E.2d 885, 895-96 (1999) (publication of photograph of victim's children to jury, along with their names and birth dates, held permissible).

[9] Finally, defendant argues that the introduction of the photograph of the victim, taken three months before his death, constituted prejudicial error. The trial court overruled defendant's timely objection

and admitted the photograph into evidence. After reviewing the evidence, we believe the trial court properly allowed the jury to consider this exhibit. The photograph was relevant in that it demonstrated the victim's appearance before the murder and helped establish a basis from which the medical examiner could testify as to the various wounds inflicted upon the victim. We have consistently held that, during the guilt-innocence phase of a trial, a photograph of the victim taken before death is admissible. *See, e.g., State v. Goode,* 341 N.C. 513, 538-40, 461 S.E.2d 631, 646-47 (1995) (admission of a family photograph of the victims taken before their deaths not prejudicial).

These assignments of error are overruled.

**[10]** Defendant argues that his first-degree felony murder conviction must be vacated because the evidence failed to support the underlying felony of armed robbery. At the close of the guilt-innocence phase of the trial, defendant moved to dismiss the murder charge based upon insufficiency of the evidence. The trial court denied the motion and allowed the jury to consider whether defendant was guilty of first-degree murder under theories both of premeditation and deliberation and of felony murder. The jury returned a verdict of guilty of first-degree murder on the basis of felony murder only. Defendant argues that the evidence showed that defendant beat the victim after being slapped and insulted by the victim and took the victim's wallet only as an "afterthought."

A motion to dismiss on the ground of sufficiency of the evidence raises for the trial court the issue "whether there is substantial evidence of each essential element of the offense charged and of the defendant being the perpetrator of the offense." *State v. Crawford,* 344 N.C. 65, 73, 472 S.E.2d 920, 925 (1996). The existence of substantial evidence is a question of law for the trial court, which must determine whether there is relevant evidence that a reasonable mind might accept as adequate to support a conclusion. *State v. Vause,* 328 N.C. 231, 236, 400 S.E.2d 57, 61 (1991). "The court must consider the evidence in the light most favorable to the State and give the State the benefit of every reasonable inference from that evidence." *State v. Lucas,* 353 N.C. 568, 581, 548 S.E.2d 712, 721 (2001). The evidence may be direct, circumstantial, or both. *State v. Locklear,* 322 N.C. 349, 358, 368 S.E.2d 377, 382-83 (1988).

To survive defendant's motion to dismiss the armed robbery charge, the prosecution must have offered substantial evidence of the following:

(1) the unlawful taking or an attempt to take personal property from the person or in the presence of another (2) by use or threatened use of a firearm or other dangerous weapon (3) whereby the life of a person is endangered or threatened.

*State v. Beaty*, 306 N.C. 491, 496, 293 S.E.2d 760, 764 (1982), *overruled on other grounds by State v. White*, 322 N.C. 506, 369 S.E.2d 813 (1988); *see also* N.C.G.S. § 14-87(a) (2001). Viewing all of the evidence in the light most favorable to the State, we conclude that the trial court did not err in denying defendant's motion to dismiss the armed robbery charge. Although defendant claims he was provoked, according to defendant's own statement, he approached the victim twice to borrow money. When the victim declined to make a second loan, defendant struck the victim several times on the head with a sledgehammer. After the victim fell, defendant reached into the victim's back pocket, removed his wallet, then left the scene to clean up. Defendant argues the taking of the wallet after the beating was only an opportunistic act that fails to meet the requirements under the armed robbery statute.

The evidence does not support defendant's contention. We have held that

> [t]he commission of armed robbery as defined by N.C.G.S. § 14-87(a) does not depend upon whether the threat or use of violence precedes or follows the taking of the victims' property. Where there is a continuous transaction, the temporal order of the threat or use of a dangerous weapon and the takings is immaterial. *State v. Rasor*, 319 N.C. 577, 587, 356 S.E.2d 328, 335 [(1987)]; *State v. Hope*, 317 N.C. 302, 306, 345 S.E.2d 361, 364 (1986). Further, provided that the theft and the force are aspects of a single transaction, it is immaterial whether the intention to commit the theft was formed before or after force was used upon the victims. *State v. Fields*, 315 N.C. 191, 337 S.E.2d 518 (1985).

*State v. Green*, 321 N.C. 594, 605, 365 S.E.2d 587, 594, *cert. denied*, 488 U.S. 900, 102 L. Ed. 2d 235 (1988). The prosecution provided substantial evidence to support every element of armed robbery. Defendant wanted to borrow more money, but the victim refused the loan request. The fatal blows to the victim's skull, the taking of his wallet, and the discarding of evidence occurred in an unbroken transaction after the victim turned his back to defendant. The particular point in this sequence where the robbery occurred is immaterial. "When, as here, the death and the taking are so connected as to form

a continuous chain of events, a taking from the body of the dead victim is a taking 'from the person.' " *State v. Fields*, 315 N.C. at 202, 337 S.E.2d at 525. This assignment of error is overruled.

[11] Defendant also argues in several assignments of error that the prosecutor's closing arguments to the jury during the guilt-innocence phase of his trial were improper in numerous respects. Defendant contends the trial court erred when it allowed the prosecutor to comment improperly on defendant's exercise of his right not to testify at trial. During his guilt-innocence phase closing argument, the prosecutor pointed out that defendant struck the victim fourteen times, then made the following pertinent comments:

> [Defendant] broke [the victim's] skull out of his head. Fourteen times. He can't—he can't stand 14 times. You can['t] justify 14 times, ladies and gentlemen; you can't.
>
> Think of what this man was going through. He had every reason to live. He had every—he had a family. He had a wife and a daughter. He worked, lived and breathed and ate and drank and had money, had good times and bad times just like every one of us, you and I. And he sat there and he just died on a cold slab of concrete; fourteen blows.
>
> *Get him to explain 14 blows to you.*
>
> [DEFENSE COUNSEL]: Objection.
>
> THE COURT: Overruled.

(Emphasis added.) Later during that same argument the prosecutor described the evidence at the scene of the killing and argued:

> What did [the evidence] tell you? Almost all the blood spots what? Were up or sideways or they were all only about this high up (demonstrating). So now, for it to be sideways, he's going to have to be somewhere right in here, a few feet off the ground. Those up ones, he's going to have to be on the ground.
>
> If [defendant] wasn't beating [the victim], and just slamming his head with this hammer while [the victim] was on the ground, *ask him to tell you how the blood got up on this white bin—*
>
> [DEFENSE COUNSEL]: Objection.
>
> THE COURT: Overruled.

(Emphasis added.)

We must determine whether the trial court erred in overruling defendant's objection.

> We have consistently held that counsel must be allowed wide latitude in the argument of hotly contested cases. He may argue to the jury the facts in evidence and all reasonable inferences to be drawn therefrom together with the relevant law so as to present his side of the case. Whether counsel abuses this privilege is a matter ordinarily left to the sound discretion of the trial judge, and we will not review the exercise of this discretion unless there be such gross impropriety in the argument as would be likely to influence the verdict of the jury. . . . It is the duty of the trial judge, upon objection, to censor remarks not warranted by the evidence or the law and, in cases of gross impropriety, the court may properly intervene, *ex mero motu.*

*State v. Covington*, 290 N.C. 313, 327-28, 226 S.E.2d 629, 640 (1976) (citations omitted). In making our determination, we examine the full context in which the statements were made. *State v. Lloyd*, 354 N.C. 76, 113-14, 552 S.E.2d 596, 622-23 (2001).

Because defendant did not present any evidence during the guilt-innocence phase, he was entitled to both the first and the last closing arguments. *See* Gen. R. Pract. Super. and Dist. Ct. 10, 2002 Ann. R. N.C. 8. Our review of the relevant portions of trial transcripts reveals that the prosecutor was responding to contentions made by defense counsel during defendant's first closing argument. In defendant's initial closing argument, his counsel argued that defendant admitted in his statement to police that he committed the crime but that the facts of the case did not amount to premeditated and deliberate murder. Counsel for defendant stated:

> [Defendant] does not deny that he committed this crime. . . . He admitted to it in his statement. But we contend to you that it is not first degree murder. We contend that it was not premeditated. He did not go there intending to kill. . . .
>
> . . . .
>
> . . . We do deny that it's first degree murder. It's our position and we contend that [defendant] is guilty of voluntary manslaughter.
>
> . . . .

You heard the medical examiner get on the stand and testify that there may have been another weapon involved but he's not absolutely sure. . . . Nowhere in [defendant's] statement did he mention that he used another weapon. And there again, like I said earlier, the State wants you to believe part of his statement but not all of it.

In his argument, the prosecutor sought to rebut defendant's assertions that the murder was not premeditated. By stating "[g]et him to explain 14 blows to you," the prosecutor was not remarking on defendant's silence but rather challenged defense counsel to explain in their closing argument why fourteen blows to the victim's head with, apparently, more than one weapon did not amount to premeditated and deliberate murder. We have stated that prosecutors "may comment on a defendant's failure to produce witnesses or exculpatory evidence to contradict or refute evidence presented by the State." *State v. Reid*, 334 N.C. 551, 555, 434 S.E.2d 193, 196 (1993). In *Reid*, this Court held that it was error for the prosecutor to comment directly on a defendant's right not to testify by stating, " 'The defendant has not taken the stand in this case.' " *Id.* at 554-58, 434 S.E.2d at 196-98; *see also State v. Waddell*, 11 N.C. App. 577, 181 S.E.2d 737 (1971). In the case at bar, however, the prosecutor did not directly implicate defendant's right not to testify. Instead, the prosecutor attempted to demonstrate to the jury that defense counsel's argument that the murder was not premeditated could not explain either defendant's statement to police or the nature of defendant's attack on the victim.

Defendant complains the prosecutor made several improper "indirect" comments about defendant's failure to testify. Specifically, defendant points to the following arguments:

Dr. Barr tells us he can't say for certain, and we don't know, but he said he believes there were two different instruments. . . .

. . . .

You saw the abrasions on the side of [the victim's] face. You say, "Well, what does that mean?" . . .

. . . .

Well, how did that happen? I contend to you that the evidence—the evidence is speaking to you now. Listen to what it says here. The evidence is telling you that [the victim] fell and

this was a major blow that just put him down, laid him on the ground, laying [sic] on his right side. And remember how when . . . Dr. Barr talked about the scrape marks; how that was consistent with him having been moved for some reason? Who knows what was going on in [defendant's] mind? . . .

. . . .

Why [defendant] moved him; who knows? Felipe didn't move. [The victim] didn't move on his own.

Because defendant did not object to these arguments at trial, we must determine whether the trial court's failure to intervene *ex mero motu* constituted an abuse of discretion. *See State v. Anthony*, 354 N.C. at 423, 555 S.E.2d at 590. A " 'trial court is not required to intervene *ex mero motu* unless the argument strays so far from the bounds of propriety as to impede defendant's right to a fair trial.' " *State v. Smith*, 351 N.C. at 269, 524 S.E.2d at 41 (quoting *State v. Atkins*, 349 N.C. 62, 84, 505 S.E.2d 97, 111 (1998), *cert. denied*, 526 U.S. 1147, 143 L. Ed. 2d 1036 (1999)). In the instant case, even assuming that the prosecutor's rhetorical question can be perceived as touching on defendant's decision not to testify, the trial court did not commit error by failing to intervene *ex mero motu. See State v. Fletcher*, 348 N.C. at 322-23, 500 S.E.2d at 685-86 (argument about unanswered questions served to remind jury that it could nevertheless find defendant guilty beyond a reasonable doubt).

Defendant contends that on at least three occasions, the prosecutor improperly stated that the State's case was "uncontradicted." Again, because defendant did not object to this argument, we must determine whether the argument was so grossly improper that the trial court should have intervened *ex mero motu. See State v. Lloyd*, 354 N.C. at 116, 552 S.E.2d at 624. In addressing whether it is improper for the prosecution to characterize a case as "uncontradicted," this Court has stated that

[c]ontradictions in the State's evidence, if such existed, could have been shown by the testimony of others or by cross-examination of the State's witnesses themselves. Thus the prosecution was privileged to argue that the State's evidence was uncontradicted and such argument may not be held improper as a comment upon defendant's failure to testify.

*State v. Smith*, 290 N.C. 148, 168, 226 S.E.2d 10, 22, *cert. denied*, 429 U.S. 932, 50 L. Ed. 2d 301 (1976). Based upon our review of the

record, we hold that the trial court did not err in failing to intervene *ex mero motu*. This assignment of error is overruled.

**[12]** Defendant asserts the prosecutor improperly argued that the Bible endorsed a guilty verdict:

> Why did [the victim] die? It's the oldest reason in the book: Greed, pure and simple. [The victim] had something and [defendant] wanted it and he was determined to take it from him.
>
> You know, Cain killed Abel because he had something he wanted. He killed him because he had God's blessing; and he didn't like that so he killed him. It goes back to Biblical times. . . .
>
> . . . .
>
> You know what? [The victim] still speaks to us today. He's speaking to us right now. He's been speaking to us throughout this whole trial. He's been telling you what happened. He's not only told you who killed him— . . . he's told us how he was killed. And you say, "How has he done that? How has [the victim] told us that?" His very life blood as it spewed out of his body, as it flows from the wounds being inflicted upon him, from his head, that very life blood speaks to us today. The blood that gave him life, speaks to you today in death. . . .
>
> After Cain killed Abel, God said to Cain "What has thou done? The voice of thy brother's blood cryest up to me from the ground." . . .
>
> The voice of [the victim], the voice of his blood, cries unto you from the ground. It tells you what happened here.
>
> There's no mistake. There's no confusion. It speaks to you and it says that that man, with malice in his heart, with premeditation and with deliberation and during the commission of a felony, a violent felony, brutally, horrifically beat his head to a pulp . . . .
>
> . . . .
>
> . . . I dare say, forevermore, you'll ever be able to put the voice of [the victim's] life blood as it cries up to you from the ground, ladies and gentlemen. Treat this case as it is deserving. Convict the defendant of first degree murder on both theories. Tell him, "No. We're not going to have this. This, we don't allow."

Defendant did not object to these statements at trial. Consequently, our standard of review is whether the prosecutor's arguments were so grossly improper that the trial court erred in failing to intervene *ex mero motu*. *State v. Trull*, 349 N.C. 428, 451, 509 S.E.2d 178, 193 (1998), *cert. denied*, 528 U.S. 835, 145 L. Ed. 2d 80 (1999).

This Court has strongly cautioned against the use of arguments based on religion.

> Jury arguments based on any of the religions of the world inevitably pose a danger of distracting the jury from its sole and exclusive duty of applying secular law and unnecessarily risk reversal of otherwise error-free trials. Although we may believe that parts of our law are divinely inspired, it is the secular law of North Carolina which is to be applied in our courtrooms. Our trial courts must vigilantly ensure that counsel for the State and for defendant do not distract the jury from their sole and exclusive duty to apply secular law.

*State v. Williams*, 350 N.C. 1, 27, 510 S.E.2d 626, 643 (citations omitted), *cert. denied*, 528 U.S. 880, 145 L. Ed. 2d 162 (1999). Even so, "this Court has repeatedly noted the wide latitude allowed counsel in arguing hotly contested cases, and it has found biblical arguments to fall within permissible margins more often than not." *State v. Artis*, 325 N.C. 278, 331, 384 S.E.2d 470, 500 (1989) (citations omitted), *sentence vacated on other grounds*, 494 U.S. 1023, 108 L. Ed. 2d 604 (1990).

The remarks in this case are not so grossly improper that the trial court erred when it failed to intervene *ex mero motu*. The prosecutor did not argue that the Bible commanded a guilty verdict. Instead, he analogized the murder of Abel by Cain to the case at bar chiefly for the purpose of emphasizing the importance of the evidence derived from the victim's blood and to point out that the blood "spoke" after the victim had been silenced. Nevertheless, we again take this opportunity to discourage litigators from making gratuitous biblical references and religious arguments. *State v. Rogers*, 355 N.C. 420, 464, 562 S.E.2d 859, 886 (2002).

**[13]** Next, defendant argues the trial court abused its discretion when it failed to sustain his objection to the prosecutor's argument that defendant did not call a dentist to corroborate his defense. In his inculpatory statement to police, defendant claimed that on the night of the murder he had a toothache and that the victim slapped him on

the cheek, causing considerable pain. During the prosecutor's closing argument, he made the following pertinent argument:

> You know, [defendant] talked about—I tell you—you know he talked about these statements. You know, "My tooth was hurting and [the victim] slapped it and it really hurt really bad. And so that made [defendant], you know, just really angered [defendant]." Why didn't he call a dentist?

> [DEFENSE COUNSEL]: Objection.

> THE COURT: Overruled.

> [PROSECUTOR]: Why didn't he call a dentist? Come in and say, "Well, you know if it was that bad a toothache"—don't you know—don't you know, ladies and gentlemen, that you would have gone to the dentist in the next few days; that you would have seen somebody? Or there would have been somebody that would have come in and said, "Yeah; I saw him. I know he had a bad toothache. I can testify to that.["] But, I didn't see a single person that came up here and testified to that for him; did they? Not a single person. Why is that? 'Cause it wasn't a toothache. He wasn't hurting that bad. If he had hurt that bad, he wouldn't have volunteered to work that next day.

The prosecution may argue that a defendant failed to produce a witness or other evidence to refute the State's case. *See, e.g., State v. Morston,* 336 N.C. 381, 406, 445 S.E.2d 1, 15 (1994); *State v. Mason,* 315 N.C. 724, 732, 340 S.E.2d 430, 436 (1986). Here, the prosecution's theory of the case was that defendant killed the victim with premeditation and deliberation and for the purpose of taking his money. Defense counsel used defendant's statement that he had a toothache to argue that defendant was provoked to attack by the slap. In response, the prosecutor argued that defendant did not call a dentist because defendant never had a toothache. Based on this record, we hold that the trial court did not abuse its discretion in overruling defendant's objection.

[14] Finally, defendant contends the prosecutor's closing argument misstated the law concerning the reason why the trial court was submitting voluntary manslaughter:

> If someone intentionally inflicts wounds on a person with a deadly weapon, slamming or hitting their head with a three-pound hammer, resulting in the blows that resulted in this case

and it results in his death without just cause or justification, that's malice. That is one element for first degree murder.

It's also an element of second degree murder. I can tell you that if you find there is malice in this case, you don't even go to manslaughter because manslaughter is a case—as it [sic] the instruction includes—it basically says the killing of a human being without malice. If you find malice, it's not a manslaughter case. It's not anywhere close but you will be instructed about that because the law requires that you be instructed on that and that's the only reason that you will be instructed.

Again, defendant did not object to this argument, so we review to determine "whether the argument was so grossly improper that the trial court erred in failing to intervene *ex mero motu*." *State v. Call*, 353 N.C. 400, 416-17, 545 S.E.2d 190, 201, *cert. denied*, 534 U.S. 1046, 151 L. Ed. 2d 548 (2001).

Voluntary manslaughter is defined as the unlawful killing of a human being without malice, either express or implied, *State v. McNeil*, 350 N.C. 657, 690, 518 S.E.2d 486, 506 (1999), *cert. denied*, 529 U.S. 1024, 146 L. Ed. 2d 321 (2000), and is a lesser included offense of first-degree murder, *State v. Thomas*, 325 N.C. 583, 591, 386 S.E.2d 555, 559 (1989). The trial court determined at the charge conference that evidence existed to support charging the jury as to voluntary manslaughter. Knowing what the judge would charge, the prosecutor addressed the alternatives that would be presented to the jury and argued to the jury that it should not find defendant guilty of this lesser included offense.

The challenged argument correctly stated that voluntary manslaughter did not include the element of malice. In fact, the judge's instruction to the jury as to that offense specifically defined manslaughter as "the unlawful killing of a human being without malice and without premeditation and without deliberation." Consequently, the prosecutor was correct when he argued that if the jury found defendant acted with malice, voluntary manslaughter was not a possible verdict. The prosecutor then discussed the evidence and contended that there was no question that defendant's actions were malicious; that the issue was not even close; and that a verdict of manslaughter therefore would be not only unwise, but also improper. Although defendant objects to the prosecutor's argument that voluntary manslaughter was being submitted only because the law required it, we perceive that the prosecutor was instead arguing

his theory of the case and asking the jury to reject any interpretation of the evidence that would allow it to return a verdict of guilty of voluntary manslaughter. The argument was not so improper as to warrant intervention by the trial court. Moreover, the court preliminarily instructed the jury before the parties argued that the final arguments were not evidence but were a permissible attempt by the attorneys to persuade the jury to return a particular verdict. At the conclusion of all the arguments, the court further instructed the jury that it was "absolutely necessary that you understand and apply the law as I give it to you and not as you think it is or as you might like it to be." Therefore, the jury was notified that the attorneys' arguments were only advocacy, while the court supplied the law.

These assignments of error are overruled.

## SENTENCING ISSUES

[15] In another assignment of error, defendant argues that the sentencing proceeding testimony of State's witness Rebecca Campbell was unfairly prejudicial. During the capital sentencing proceeding, the trial court admitted into evidence a written judgment from the United States Army General Court Martial detailing that in 1984 defendant pled guilty to and was convicted of the rape of Campbell. The prosecution introduced this evidence in support of the submission of the (e)(3) statutory aggravating circumstance, that defendant had been previously convicted of a felony involving the use or threat of violence to the person. *See* N.C.G.S. § 15A-2000(e)(3) (2001). The prosecution then called Campbell to testify to the events surrounding the attack and rape by defendant. Defendant argues that her testimony was irrelevant and inadmissible, constituted a violation of defendant's Eight and Fourteenth Amendment rights, and was plain error.

Defendant contends several errors occurred during Campbell's testimony. We will consider these claims *seriatim*. As we do, we note that North Carolina's capital punishment statute provides in pertinent part that, during the sentencing phase,

[e]vidence may be presented as to any matter that the court deems relevant to sentence, and may include matters relating to any of the aggravating or mitigating circumstances enumerated in subsections (e) and (f) of this section. Any evidence which the court deems to have probative value may be received.

N.C.G.S. § 15A-2000(a)(3). Evidence is admissible at the capital sentencing proceeding if it is relevant, competent, and probative. *State v. Bond*, 345 N.C. 1, 31, 478 S.E.2d 163, 179 (1996), *cert. denied*, 521 U.S. 1124, 138 L. Ed. 2d 1022 (1997). More specifically, this Court has held that "the State is entitled to present witnesses in the penalty phase of the trial to prove the circumstances of prior convictions and is not limited to the introduction of evidence of the record of conviction." *State v. Roper*, 328 N.C. 337, 365, 402 S.E.2d 600, 616, *cert. denied*, 502 U.S. 902, 116 L. Ed. 2d 232 (1991).

Defendant claims the trial court erroneously admitted hearsay testimony from Campbell when she testified, over defendant's objection, that as defendant was attempting to remove her clothes, his friends advised her "to do what [defendant] says because he's crazy." Although this Court has held that hearsay is admissible at a capital sentencing proceeding, *see State v. Golphin*, 352 N.C. at 466, 533 S.E.2d at 234, this statement was not hearsay. "When evidence of a statement by someone other than the testifying witness is offered for a purpose other than to prove the truth of the matter asserted, the evidence is not hearsay." *State v. Reid*, 335 N.C. 647, 661, 440 S.E.2d 776, 784 (1994). The statement that defendant was crazy was offered not for the truth of the matter asserted, but rather to explain the effect of the words on the victim. Therefore, the testimony was properly admitted by the trial court.

As to defendant's remaining arguments in this assignment of error, we review for plain error because defendant did not object to any of the testimony he now claims was improper. *See* N.C. R. App. P. 10(b)(2); *State v. Braxton*, 352 N.C. 158, 223, 531 S.E.2d 428, 465 (2000), *cert. denied*, 531 U.S. 1130, 148 L. Ed. 2d 797 (2001). Defendant argues that Campbell's testimony was prejudicially graphic and inflammatory. However, in *State v. Moseley*, 336 N.C. 710, 720, 445 S.E.2d 906, 911-12 (1994), *cert. denied*, 513 U.S. 1120, 130 L. Ed. 2d 802 (1995), this Court determined that it was not error for the State to introduce at sentencing testimony from the victim of a prior violent felony to support the (e)(3) aggravating circumstance even though the testimony tended to be graphic. We have reviewed the testimony in question and have determined that it is not so vivid or disturbing as to be unfairly prejudicial to defendant. Instead, the testimony described in reasonably objective terms the number of injuries sustained by the victim and the effect of the incident on her life. Accordingly, this evidence was admissible to illuminate the circumstances surrounding the prior violent felony committed by defendant.

Defendant argues the trial court erroneously failed to exclude testimony from Campbell that she was "extremely bitter" with defendant. This evidence came out when defense counsel asked her on cross-examination: "I take it you're sort of bitter with the military." The court overruled the prosecutor's objection, and defense counsel asked the question again in more general terms: "I take it you're bitter." She responded, "Not the military; I'm extremely bitter, yes, with [defendant] because of what he did to me and he ruined my life. [Defendant] ruined my health. [Defendant] ruined my emotional stability and my mental ability." Defendant did not elicit this testimony because his original question was limited to Campbell's perceptions of the military. Nevertheless, in her previous testimony, Campbell detailed the many psychological and physical difficulties she had experienced as a result of being raped. She pointed out that defendant's question was accurate in assuming that she had been embittered but was inaccurate as to the reason. The court did not err in failing *sua sponte* to strike this testimony.

Finally, defendant alleges that Campbell stated that her testimony was true. Our examination of the transcript reveals one statement where Campbell responds to a question by stating that she has truthfully testified as to her recollection of events. Because she was not claiming to have testified as to the objective truth, we find no error in this testimony.

After a thorough review of the record, we determine that the trial court did not commit error or plain error in permitting the admission of the testimony of Campbell. This assignment of error is overruled.

Defendant also assigns as error six aspects of the prosecutor's closing arguments during the capital sentencing proceeding. Defendant objected to one of these aspects. As to the rest, our standard of review is to determine whether the argument was so grossly improper as to warrant the trial court's intervention *ex mero motu*. *State v. Craig*, 308 N.C. 446, 457, 302 S.E.2d 740, 747, *cert. denied*, 464 U.S. 908, 78 L. Ed. 2d 247 (1983).

[16] First, defendant contends the prosecutor told the jury that defendant requested the submission of the (f)(1) mitigating circumstance, that defendant has no significant history of prior criminal activity. N.C.G.S. § 15A-2000(f)(1). In fact, at the charge conference, defendant specifically requested that the (f)(1) mitigator not be submitted, but the trial court nevertheless instructed as to this circum-

stance. During the prosecutor's closing argument at sentencing, he stated:

> Let's—Number 1, they'll present, well that's—you'll have—the Court will present to you—on this piece of paper is one that says, "Has the defendant previously been convicted of a felony involving the use or threat of violence?" You know, that's Number 1. "The defendant has no significant history of criminal—of prior criminal activity."

While a prosecutor may not argue to a jury that a defendant submitted the (f)(1) mitigating circumstance when defendant has objected to its use, in the case at bar we do not find that the prosecutor's argument was grossly improper. The prosecutor immediately corrected himself during his argument by stating that the court would present the mitigating circumstance to the jury. Further, we have held that any misunderstanding can be cured when the trial court instructs that the defendant did not seek this mitigating circumstance. *State v. Parker*, 350 N.C. 411, 437, 516 S.E.2d 106, 124 (1999), *cert. denied*, 528 U.S. 1084, 145 L. Ed. 2d 681 (2000); *State v. Walker*, 343 N.C. 216, 223, 469 S.E.2d 919, 923, *cert. denied*, 519 U.S. 901, 136 L. Ed. 2d 180 (1996). In the case *sub judice*, the trial court gave such an instruction.

[17] Second, defendant argues that, at least on two occasions, the prosecutor argued facts outside the record. Specifically, defendant complains the prosecutor argued that "[defendant] said 'He slapped me.' There's no evidence of that," and that "[the victim] probably could have lived but [defendant] did not know that."

We have held that "[t]rial counsel is allowed wide latitude in argument to the jury and may argue all of the evidence which has been presented as well as reasonable inferences which arise therefrom." *State v. Guevara*, 349 N.C. 243, 257, 506 S.E.2d 711, 721 (1998), *cert. denied*, 526 U.S. 1133, 143 L. Ed. 2d 1013 (1999). As to the prosecutor's statement that there was no evidence that the victim slapped defendant, the record of the prosecutor's entire argument shows that he acknowledged that defendant's statement included the claim that the victim slapped him. The prosecutor's argument about the lack of evidence, therefore, may be read as pointing out that defendant's statement was uncorroborated. The prosecutor's comment that the victim might have lived is harder to understand in light of the severity of the victim's injuries. Presumably, the prosecutor was not referring to that portion of defendant's statement where he said the victim

was still mumbling and stirring after the assault, because defendant was the source of that information. At any rate, the statement was only a passing comment made in a lengthy argument, and even if defendant had objected, we fail to see that it could have had any prejudicial effect. After a review of the record, we believe these statements were not so grossly improper as to warrant intervention by the trial court *ex mero motu.*

[18] Third, defendant claims he deserves a new sentencing hearing because the prosecutor improperly introduced race into his sentencing phase closing argument.

> Can [the victim] and his family receive justice in Sampson County?
>
> . . . .
>
> Can they receive justice in Sampson County? They look different than us, they don't speak the language that I—we speak. They come in here and we have to have somebody speak the language for us. [The victim] didn't speak the language. He was a foreigner.
>
> We see them [at] the Piggly Wiggly and just don't feel comfortable and it's just not—we don't know how to relate. Sometimes, they're almost invisible. Don't let [the victim] and his family be invisible to you. He deserves the same justice that all of us enjoy; the same protection of the law. [The victim]—each of you said that you agreed with that.

After examining the full transcript and the context in which these comments were made, we hold that the statements were not so grossly improper that the trial court should have intervened *ex mero motu.* The prosecutor's arguments were not designed to generate an issue of race in the trial. Instead, the prosecutor sought to remind the jury of the victim's humanity and to point out that, despite the victim's unexalted social status and modest economic means, his murder was as consequential as the killing of any other mortal. *See* William Shakespeare, *Merchant of Venice* act 3, sc. 1, 60-69.

[19] Fourth, defendant contends the prosecutor misstated the law at least five times during his closing argument in the sentencing proceeding. Specifically, defendant argues that the prosecutor incorrectly argued (1) that mitigating circumstances were synonymous with excuses, (2) that fewer than all jurors could find an aggravating

circumstance, (3) that the jury could return a death sentence based solely on the aggravating circumstances, (4) that the prosecutor misrepresented the significance of Issue Three, and (5) that the prosecutor erroneously told the jury that it had already found an aggravating circumstance of pecuniary gain because it had convicted defendant of armed robbery in the guilt-innocence phase. Defendant objected only to the fifth alleged misstatement; as to the others, we review the record to determine whether the prosecutor's statements were grossly improper. "A trial court is not required to intervene *ex mero motu* where a prosecutor makes comments during closing argument which are substantially correct 'shorthand summaries' of the law, 'even if slightly slanted toward the State's perspective.'" *State v. Warren*, 347 N.C. 309, 322, 492 S.E.2d 609, 616 (1997) (quoting *State v. Frye*, 341 N.C. 470, 491, 461 S.E.2d 664, 682-83 (1995), *cert. denied*, 517 U.S. 1123, 134 L. Ed. 2d 526 (1996)), *cert. denied*, 523 U.S. 1109, 140 L. Ed. 2d 818 (1998).

After a careful review of each statement alleged as error, we find no gross impropriety in the prosecutor's arguments. *See, e.g., State v. Hill*, 347 N.C. 275, 299, 493 S.E.2d 264, 278 (1997) (no gross impropriety where mitigating circumstances characterized by prosecutor as excuses), *cert. denied*, 523 U.S. 1142, 140 L. Ed. 2d 1099 (1998); *State v. Frye*, 341 N.C. at 491, 461 S.E.2d at 682-83 (prosecutor's slightly slanted statements as to significance of Issue Three not grossly improper). The statements made by the prosecutor, while not technically correct, were not so misleading that the trial court erred by failing to intervene *ex mero motu*. Most important, any misstatements of law by the prosecutor were cured by proper instructions given by the trial court when it charged the jury. Finally, we address the prosecutor's comment to the jury that its conviction of defendant for armed robbery established the aggravating circumstance of pecuniary gain. Although defendant raised a timely objection to this argument, we do not perceive that defendant could have been prejudiced by the prosecutor's statement. The jury had already returned a verdict of guilty of armed robbery, and the court was going to submit pecuniary gain as a possible aggravating circumstance for the jury to consider at sentencing. The prosecutor's statement that armed robbery "is" pecuniary gain was not so wide of the mark as to constitute reversible error.

[20] Fifth, defendant contends that the prosecutor improperly argued that the jury's accountability to its community should lead it to vote for death. The prosecutor argued:

You took an oath. You became—you became the voice and the moral conscious [sic] of this community.

[DEFENSE COUNSEL]: Objection.

THE COURT: Just a moment. It's overruled. You may proceed.

[PROSECUTOR]: Thank you, Your Honor.

You become the voice and the moral conscious [sic] of this community. That's what your position is now. As a result, you have an obligation to do something about this crime.

[DEFENSE COUNSEL]: Objection.

THE COURT: Your objection is overruled. You may proceed.

[PROSECUTOR]: I contend to you that the buck stops here. If you let this man have life, you'll be doing yourself, this community and this State a disservice.

This Court has consistently held that a prosecutor may argue that a jury is "the voice and conscience" of the community. *State v. Brown*, 320 N.C. 179, 204, 358 S.E.2d 1, 18, *cert. denied*, 484 U.S. 970, 98 L. Ed. 2d 406 (1987); *State v. Bishop*, 346 N.C. 365, 396, 488 S.E.2d 769, 786 (1997). A prosecutor may also ask the jury to "send a message" to the community regarding justice. *State v. Artis*, 325 N.C. at 329-30, 384 S.E.2d at 499-500. In contrast, we have held that a prosecutor cannot encourage the jury to "lend an ear to the community." *State v. Golphin*, 352 N.C. at 471, 533 S.E.2d at 237. In other words, the jury may speak for the community, but the community cannot speak to the jury. Accordingly, we hold that the prosecutor properly argued to the jury that it was the voice and moral conscience of the community without suggesting that the jury "lend an ear to the community." Instead, the prosecutor urged the jury to remember that the final responsibility for the case rested with them. In *State v. Miller*, 315 N.C. 773, 779, 340 S.E.2d 290, 293-94 (1986), we held a similar argument proper where the prosecutor argued:

"The buck stops in these 12 seats right here. If anything is going to be done about serious crime—this case . . .

"MR. HARRIS: Objection.

"THE COURT: Overruled.

"or any other case where 12 people can come in and occupy these 12 seats, that's what i[t] comes down to and I know that you're

conscientious individuals and people with abundance of reason and common sense and I'm going to sit down here in just a moment confident that you're going to do the right thing and I suggest to you the right thing is to find Jerry Miller guilty of three counts of armed robbery . . . ."

In the case at bar, the prosecutor did not contend that the community demanded defendant's execution. Instead, he asked the jury not to do itself and the community the "disservice" of returning a recommendation of life imprisonment. Based upon our review of the record, we hold that the trial court did not abuse its discretion in overruling defendant's objections to the argument.

[21] Sixth, and finally, defendant contends the trial court committed error when it allowed the prosecutor to argue that defendant killed the victim to eliminate him as a witness. After discussing defendant's 1984 rape conviction, the prosecutor made the following argument: "But [defendant] left a witness the last time; didn't he? It cost him three and a half years in Fort Leavenworth, Kansas. If there's one thing you can say about [defendant] it's that he learns."

Defendant did not object to this comment, so we review the record for evidence of gross impropriety. The prosecution did not request an instruction as to the (e)(4) aggravating circumstance. However, the jury found that defendant was guilty of armed robbery, the felony supporting the felony murder conviction. Because the robbery and the infliction of mortal wounds on the victim in the instant case were intertwined parts of a continuous transaction, *State v. Olson*, 330 N.C. 557, 566, 411 S.E.2d 592, 597 (1992), the prosecutor's comments on efforts arguably made by defendant to escape successfully and enjoy the use of the stolen money were not so grossly improper as to require the court to intervene *ex mero motu, see State v. Oliver*, 302 N.C. 28, 62, 274 S.E.2d 183, 204 (1981).

[22] Defendant renews in the context of sentencing his contention that the trial court erred when it admitted the State's sentencing evidence and argument concerning both the victim's good character and the impact of the crime on the victim's family. Victim-impact statements may be used during a capital sentencing proceeding because the State has "the right to offer admissible evidence of the impact of the crime, which shall be considered by the court or jury in sentencing the defendant." N.C.G.S. § 15A-833 (2001). Victim-impact statements may include "[a] description of the nature and extent of any physical, psychological, or emotional injury suffered by the victim as

a result of the offense committed by the defendant." *Id.* However, any evidence "so unduly prejudicial that it renders the trial fundamentally unfair" is inadmissible. *Payne v. Tennessee,* 501 U.S. 808, 825, 115 L. Ed. 2d 720, 735 (1991).

We first address the testimony as to the victim's character. In this case, the victim's wife came to the United States for the trial. She testified at the sentencing proceeding that she and the victim had a six-year-old daughter. The victim had worked in Sampson County and had sent money to her in Mexico to support the family. When asked to describe the victim as a father and a husband, she replied, "[H]e was very good. He worked to give us the best." One of the victim's brothers testified through an interpreter that

> [the victim] was a person, noble, respected, he was a working man. He came from Mexico to work here in the United States—
>
> [DEFENSE COUNSEL]: Objection. Motion to strike that response.
>
> THE COURT: It's overruled. You may continue.
>
> [WITNESS]: . . . to send money to his wife [and] daughter that they were in Mexico. He would also send money to my mother. He was a responsible man for the whole, entire family.

The testimony of family members helped describe for the jury what type of person the victim had been and what had been lost when he was killed.

> "[T]he State has a legitimate interest in counteracting the mitigating evidence which the defendant is entitled to put in, by reminding the sentencer that just as the murderer should be considered as an individual, so too the victim is an individual whose death represents a unique loss to society and in particular to his family."

*Id.* (quoting *Booth v. Maryland,* 482 U.S. 496, 517, 96 L. Ed. 2d 440, 457 (1987) (White, J., dissenting) (citation omitted)). This testimony fell squarely within the reach of N.C.G.S. § 15A-833 and was not so prejudicial that it made the trial fundamentally unfair.

Defendant also contends that the prosecutor improperly argued victim-impact to the jury during his closing argument.

> You should decide this case from the evidence, on the law, and you should decide it from what is right and do justice. And

they'll tell that you shouldn't decide it on the basis of sympathy for the family and that's true. But you can consider what this family has been going through. You can consider what this family has lost. [Defendant's] lawyer is going to say you can't consider it.

[DEFENSE COUNSEL]: Objection.

THE COURT: Overruled.

[PROSECUTOR]: You can consider all of those things.

N.C.G.S. § 15A-833 permits introduction of victim-impact evidence at sentencing. Although it may have been preferable for the prosecutor to forecast that defendant's lawyer would argue that the jury *should not* consider such evidence, rather than *could not*, it is not impermissible for one side to attempt in argument to address the anticipated arguments of the opposition. *See, e.g., State v. Walls*, 342 N.C. 1, 48-49, 463 S.E.2d 738, 763 (1995), *cert. denied*, 517 U.S. 1197, 134 L. Ed. 2d 794 (1996); *State v. Daniels*, 337 N.C. 243, 279, 446 S.E.2d 298, 320-21 (1994), *cert. denied*, 513 U.S. 1135, 130 L. Ed. 2d 895 (1995). We do not find reversible error in the prosecutor's argument.

These assignments of error are overruled.

[23] Defendant contends that there was insufficient evidence to support the trial court's submission to the jury of the statutory aggravating circumstance that the murder was "especially heinous, atrocious, or cruel" pursuant to N.C.G.S. § 15A-2000(e)(9). In determining whether the evidence was sufficient to support the circumstance, this Court "must consider the evidence 'in the light most favorable to the State, and the State is entitled to every reasonable inference to be drawn therefrom.'" *State v. Flippen*, 349 N.C. 264, 270, 506 S.E.2d 702, 706 (1998) (quoting *State v. Lloyd*, 321 N.C. 301, 319, 364 S.E.2d 316, 328, *sentence vacated on other grounds*, 488 U.S. 807, 102 L. Ed. 2d 18 (1988)), *cert. denied*, 526 U.S. 1135, 143 L. Ed. 2d 1015 (1999). "[D]etermination of whether submission of the (e)(9) aggravating circumstance is warranted depends on the particular facts of each case." *State v. Call*, 353 N.C. at 424, 545 S.E.2d at 205.

We have identified three types of murders that warrant submission of the (e)(9) aggravating circumstance.

The first type consists of those killings that are physically agonizing for the victim or which are in some other way dehumanizing. *State v. Lloyd*, 321 N.C. [at] 319, 364 S.E.2d [at] 328. The

second type includes killings that are less violent but involve infliction of psychological torture by leaving the victim in his or her "last moments aware of but helpless to prevent impending death," *State v. Hamlet*, 312 N.C. [162,] 175, 321 S.E.2d [837,] 846 [(1984)], and thus may be considered "conscienceless, pitiless, or unnecessarily torturous to the victim," *State v. Brown*, 315 N.C. 40, 65, 337 S.E.2d 808, 826-27 (1985), *cert. denied*, 476 U.S. 1164, 90 L. Ed. 2d 733 (1986), *and overruled on other grounds by State v. Vandiver*, 321 N.C. 570, 364 S.E.2d 373 (1988). The third type includes killings that "demonstrate[] an unusual depravity of mind on the part of the defendant beyond that normally present in first-degree murder[s]." *Id.* at 65, 337 S.E.2d at 827.

*State v. Lloyd*, 354 N.C. at 122, 552 S.E.2d at 627-28 (citations altered; textual alterations in original).

The evidence shows that defendant borrowed money from the victim to support a drug habit, then returned that same night to solicit another loan for more drugs. When the victim refused the second request, defendant struck the victim on the head at least fourteen times. The pathologist who performed the autopsy testified that the wounds found on the victim's head were likely caused by two dissimilar weapons. At least half of the fourteen wounds penetrated to the skull, causing fracture. While the pathologist testified that two of the wounds were considered "significant injuries" to the head that would "likely instantly incapacit[ate]" the victim, defendant's statement suggested that the victim did not die immediately. Special Agent Keane, who participated in the interview of defendant on 16 April 1998, testified as follows:

[Defendant] stated that as his head was turned to the right, he observed a small, sledge-like hammer lying on top of a grinder. [Defendant] then took two steps and picked the hammer up with his right hand. [Defendant] then walked . . . up to [the victim] who was continuing to wash the equipment down. [The victim] had his back to [defendant]. [Defendant] then struck [the victim] in the back of the head three or four times with the hammer. [Defendant] indicated that it appeared that [the victim] was trying to get something, possibly a weapon,.from his left, front pants pocket. [Defendant] then struck [the victim] three more times with the hammer about the head. [The victim] then fell to his knees. [Defendant] stated that he then hit [the victim] a couple of more times in the neck area.

[The victim] then fell completely onto the floor, onto his stomach. [Defendant] stated that [the victim] was mumbling something and was moving slightly on the floor.

Viewed in the light most favorable to the State, we agree that this murder was violent and depraved. *See State v. Huffstetler*, 312 N.C. 92, 115-16, 322 S.E.2d 110, 125 (1984), *cert. denied*, 471 U.S. 1009, 85 L. Ed. 2d 169 (1985). The (e)(9) aggravating circumstance was properly submitted for the jury's consideration. This assignment of error is overruled.

**[24]** Defendant next contends that the trial court erred when it submitted the (f)(1) mitigating circumstance that "[t]he defendant has no significant history of prior criminal activity." N.C.G.S. § 15A-2000(f)(1). As noted earlier in this opinion, defendant asked the trial court during the charge conference not to instruct the jury as to this circumstance. The trial court denied defendant's request and submitted to the jury the (f)(1) mitigator in addition to the (e)(3) aggravating circumstance that defendant "had been previously convicted of a felony involving the use or threat of violence to the person," N.C.G.S. § 15A-2000(e)(3). The (f)(1) instruction included a statement by the court advising the jury that defendant had not requested the submission of that mitigating circumstance. Defendant argues the (f)(1) mitigating circumstance was not supported by the evidence and its submission violated defendant's right to a fair sentencing hearing.

This Court has held that "the test governing the trial court's decision to submit the (f)(1) mitigator is 'whether a rational jury could conclude that defendant had no *significant* history of prior criminal activity.' " *State v. Blakeney*, 352 N.C. 287, 318, 531 S.E.2d 799, 821 (2000) (quoting *State v. Wilson*, 322 N.C. 117, 143, 367 S.E.2d 589, 604 (1988)), *cert. denied*, 531 U.S. 1117, 148 L. Ed. 2d 780 (2001). If the trial court determines that a rational jury could find that defendant had no significant history of prior criminal activity, "the statutory mitigating circumstance must be submitted to the jury, without regard to the wishes of the State or the defendant." *State v. Mahaley*, 332 N.C. 583, 597, 423 S.E.2d 58, 66 (1992), *cert. denied*, 513 U.S. 1089, 130 L. Ed. 2d 649 (1995). The presence of some evidence of a defendant's prior violent criminal activity does not preclude submission of the (f)(1) mitigator. *See, e.g., State v. Billings*, 348 N.C. 169, 188-89, 500 S.E.2d 423, 435 (proper to submit (f)(1) mitigating circumstance despite the defendant's prior conviction for attempted second-degree murder as well as a history of drug-dealing), *cert. denied*, 525 U.S.

STATE v. BARDEN

[356 N.C. 316 (2002)]

1005, 142 L. Ed. 2d 431 (1998); *State v. Ball*, 344 N.C. 290, 310-11, 474 S.E.2d 345, 357 (1996) (proper to submit (f)(1) mitigating circumstance despite the defendant's convictions for robbery, felonious assault, and forgery, as well as a history of drug abuse), *cert. denied*, 520 U.S. 1180, 137 L. Ed. 2d 561 (1997).

Our review of the record reveals that the trial court properly submitted the (f)(1) mitigating circumstance. Defendant's prior criminal record consists of a 1984 conviction for rape. We believe that a rational juror could have found defendant had no significant history of prior criminal activity. Defendant tendered expert testimony that his addiction to alcohol and drugs caused him to do things that he could not control. In fact, defendant's expert, Dr. Roy Mathew, testified that defendant has

[no] breaking and entering charges—

[PROSECUTOR]: Objection.

WITNESS: —there was no history of breaking and entering—

THE COURT: Overruled.

WITNESS: —no history of mugging anybody, no history of family violence, no history of getting into fights in bars, no history of getting into fights where he was working; that, combined with reports furnished by all the clinics he has been to offer him as an introverted, shy person[,] force[s] me to[] conclude that his behavior during the night of the alleged crime was out of character with him.

Moreover, defendant sought during cross-examination of the rape victim to convince the jury that the victim's version of the events was not believable. For example, defendant elicited that although the victim claimed that she had been brutally raped, she had been treated and released from the hospital within three or four hours. Defendant was similarly able to show that the victim's statement to investigators was inconsistent with her sentencing testimony as to how much she had to drink and her state of inebriation on the night of the attack. In light of the nature of defendant's criminal history and of defendant's evidence, considered either independently or together, we conclude that the trial court properly submitted the (f)(1) mitigating circumstance.

**[25]** We also reject defendant's related assertion that the trial court erred in submitting both the (f)(1) mitigating circumstance and the

(e)(3) aggravating circumstance. We have consistently held the submission of both of these circumstances to be proper. *See State v. Blakeney*, 352 N.C. at 319, 531 S.E.2d at 821-22; *State v. Ball*, 344 N.C. at 311-13, 474 S.E.2d at 357-59; *State v. Walker*, 343 N.C. at 224-26, 469 S.E.2d at 923-24. This assignment of error is overruled.

[26] Defendant contends the trial court erred when it failed to submit defendant's proposed nonstatutory mitigating circumstance number five, which read: "Consider whether . . . defendant has a good reputation in the community in which he lives." Defendant complains that he presented eight witnesses at his sentencing proceeding whose testimony fully supported this proposed circumstance.

This Court has held that in order for a defendant to

demonstrate that the trial court erred by refusing to submit a requested nonstatutory mitigating circumstance, defendant must establish that "(1) the nonstatutory mitigating circumstance is one which the jury could reasonably find had mitigating value, and (2) there is sufficient evidence of the existence of the circumstance to require it to be submitted to the jury."

*State v. Blakeney*, 352 N.C. at 316-17, 531 S.E.2d at 820 (quoting *State v. Benson*, 323 N.C. 318, 325, 372 S.E.2d 517, 521 (1988)). Our examination of the record reveals that none of the eight witnesses testified to defendant's good reputation in the community in which he lived. For example, witnesses Dwight Thornton and Billy Ray Jacobs testified to defendant's exemplary work habits, while defendant's sister testified how defendant helped their mother during illness, and Reverend Becton spoke of defendant's service to the church. We have reviewed the testimony of all of defendant's character witnesses at the sentencing proceeding. The evidence of laudable personal characteristics and specific instances of good conduct did not address defendant's actual reputation in the community. Based upon the evidence, we hold that the trial court properly denied defendant's request for the submission of this nonstatutory mitigating circumstance to the jury.

Even assuming *arguendo* that the trial court did err, the error was harmless beyond a reasonable doubt. *See* N.C.G.S. § 15A-1443(b) (2001). "A trial court's error in failing to submit a nonstatutory mitigating circumstance is harmless 'where it is clear that the jury was not prevented from considering any potential mitigating evidence.' " *State v. Skipper*, 337 N.C. 1, 56, 446 S.E.2d 252, 283 (1994) (quoting

*State v. Green*, 336 N.C. 142, 183, 443 S.E.2d 14, 38, *cert. denied*, 513 U.S. 1046, 130 L. Ed. 2d 547 (1994)), *cert. denied*, 513 U.S. 1134, 130 L. Ed. 2d 895 (1995). The trial court submitted the following two mitigating circumstances relating to defendant's character evidence:

> (4) . . . .

> P. Friends, family and employers uniformly describe the Defendant as a peaceful, non-aggressive person.

> Q. The Defendant was a productive member of his church in the years just preceding his arrest.

Accordingly, the jury was not prevented from considering defendant's mitigating evidence. This assignment of error is overruled.

Defendant contends that the trial court erred when it refused to instruct peremptorily that five nonstatutory and one statutory mitigating circumstances submitted to the jury were supported by uncontroverted evidence. This Court has frequently noted a significant difference between statutory and nonstatutory mitigating circumstances in a capital case. If the jury finds that a statutory mitigating circumstance exists, it must also find that the circumstance has mitigating value; by contrast, the jury may find that a nonstatutory mitigating circumstance exists but has no mitigating value. *See, e.g., State v. Lawrence*, 352 N.C. at 31, 530 S.E.2d at 826. Despite this difference, where a defendant seeks a peremptory instruction as to a statutory *or* nonstatutory mitigating circumstance that is supported by uncontroverted and manifestly credible evidence, the defendant is entitled to a peremptory instruction. *State v. Green*, 336 N.C. at 173-74, 443 S.E.2d at 32-33; *State v. Gay*, 334 N.C. 467, 493, 434 S.E.2d 840, 855 (1993). Although the form of the peremptory instruction is different for statutory and nonstatutory mitigating circumstances, *State v. Green*, 336 N.C. at 173-74, 443 S.E.2d at 32-33, failure to give such an instruction where one is warranted constitutes reversible error, *State v. Gay*, 334 N.C. at 493-94, 434 S.E.2d at 855.

> It is possible that one or more of the nonstatutory mitigating circumstances found by none of the jurors would have been found by one or more of the jurors had the judge given a peremptory instruction as requested. In regard to the nonstatutory mitigating circumstances which were found by one or more jurors, we have no way of knowing whether or not they were unanimously found. If one was not unanimously found, it is possible that more jurors, or all the jurors, would have found the circum-

stance to exist and to have mitigating value had a peremptory instruction been given.

It is reasonably possible that the number of circumstances found by individual jurors in response to Issue Two at the sentencing proceeding could have had an effect on the balancing required for Issue Three. Therefore we are unable to say that the failure to peremptorily instruct the jury as to the nonstatutory mitigating circumstances which were supported by uncontroverted evidence did not impair the jury's consideration of such circumstances. Accordingly, we are unable to find the error harmless beyond a reasonable doubt. Therefore, defendant must receive a new sentencing proceeding.

*Id.* at 494, 434 S.E.2d at 855.

Although in *Gay* this Court cited a harmless error standard of review as to this issue, our above-quoted analysis effectively ruled out the likelihood of finding harmless error in any but the most unusual circumstances. Nevertheless, while the reasons supporting the remedy of virtually automatic reversal set out in *Gay* are sound, the effect is unquestionably draconian. In practice, a trial judge must recall from a trial that has extended over days or even weeks not only the evidence purporting to support a particular mitigating circumstance, but also whether other evidence controverted defendant's evidence, directly or indirectly. Even where the judge has the active assistance of trial counsel, the prospect can be daunting.

In the case at bar, defendant filed a written motion titled "Request for Peremptory Jury Instructions as to Non-Statutory Mitigating Circumstances." The judge thereafter held a charge conference and agreed to instruct as to every such circumstance requested by defendant except for one that defendant withdrew as being duplicative. The judge then reviewed each nonstatutory mitigating circumstance individually, in some cases discussed the circumstance, invited comment from defense counsel and the prosecutor, then determined whether his instruction as to that mitigating circumstance would be peremptory. In light of this procedure followed by the conscientious trial court, we will review with deference its determinations whether the record showed that a particular circumstance was controverted or manifestly credible. We consider defendant's contentions *seriatim*. As we do, we bear in mind that in *Gay* the State conceded that the evidence was uncontroverted as to defendant's nonstatutory mitigating circumstances, *id.* at 493 n.4, 434

S.E.2d at 855 n.4, while in the case at bar, the State argues that the court's decisions were justified by the record.

**[27]** Defendant submitted the nonstatutory mitigating circumstance that "[t]he Defendant was a responsible praise worthy worker who supervisors relied on." Because there was evidence to support this circumstance, the court properly submitted it to the jury. However, Dwight Thornton, one of defendant's supervisors, testified that defendant was given a leave of absence to attend a drug-treatment program. Defendant's expert, Dr. Mathew, testified that defendant's chronic alcohol abuse caused him to lose a number of jobs. Because the evidence as to this circumstance was controverted, the trial court properly declined to give a peremptory instruction.

**[28]** Defendant asked the court to instruct peremptorily that "the Defendant was a productive member of the U.S. Army, winning awards and citations, for his performance." The record shows that defendant served in the Army twice. During his first term of enlistment, defendant was a competent soldier and received an honorable discharge. However, he was convicted of rape during his second term and dishonorably discharged. In light of this decidedly mixed record, the trial court properly declined to give a peremptory instruction as to this circumstance. We also note that the court provided a peremptory instruction as to the related nonstatutory mitigating circumstance that "the Defendant was honorably discharged from the United States Army."

**[29]** Defendant sought a peremptory instruction as to the statutory mitigating circumstance that "[t]he capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired." N.C.G.S. § 15A-2000(f)(6). Defendant presented evidence of such impairment through the expert testimony of Dr. Mathew, who acknowledged that his analysis of defendant was made solely in preparation for his court appearance. We have held that the testimony of an expert witness who has prepared an analysis of a defendant in preparation for trial "lacks the indicia of reliability based on the self-interest inherent in obtaining appropriate medical treatment" and, because not "manifestly credible," does not support a peremptory instruction as to this particular mitigating circumstance. *State v. Bishop*, 343 N.C. 518, 557-58, 472 S.E.2d 842, 863-64 (1996), *cert. denied*, 519 U.S. 1097, 136 L. Ed. 2d 723 (1997). Also, as in *Bishop*, the expert testimony in the case at bar was not uncontroverted. Dr. Mathew testified on cross-examination

that he based his analysis on the amount of cocaine defendant told him he had consumed the night of the murder; however, if defendant had consumed a lesser amount of cocaine that night, Dr. Mathew would significantly change his opinion as to defendant's ability to appreciate the criminality of his conduct. The State concomitantly established that defendant advised Dr. Mathew that he had smoked eight or ten rocks of crack cocaine before the murder, but reported to police that he had consumed only three rocks. In light of Dr. Mathew's reservations and the inconsistencies between defendant's statements, we cannot say this mitigating circumstance was supported by uncontroverted and manifestly credible evidence.

[30] Defendant requested that the court provide a peremptory instruction that "the Defendant's mother abused alcohol, as did other family members." During the charge conference, the judge reviewed defendant's list of requested mitigating circumstances, discussing which ones were entitled to a peremptory instruction. When he reached the one now under consideration, he stated: "I'm not inclined to give a peremptory on that. Does the defendant wish to be heard further?" Defense counsel responded: "No." Thereafter, the court instructed as to the circumstance, but not peremptorily. The record shows that defendant called as witnesses Sally Williams, a sister, and Angeline Williams, a cousin. Sally Williams testified that their mother drank, as did other members of the family, and Angeline Williams testified that there was drinking around the house on weekends and that all the adults were alcoholics. However, there was no testimony as to defendant's presence during these drinking bouts. Although Dr. Mathew, defendant's expert, acknowledged that defendant's mother might have been an alcoholic, he could not be certain. In light of defendant's family ties with these witnesses and the lack of specific evidence as to defendant's contact with the drinking, we cannot say that uncontroverted and manifestly credible evidence existed to support a peremptory charge as to this mitigating circumstance.

[31] Defendant requested a peremptory instruction that "the Defendant was exposed to violence among family members as a child." When this instruction was discussed at the charge conference, the judge stated, "[A]s to [this circumstance], not inclined to give it [peremptorily]." Defense counsel replied, "I don't wish to be heard." The record establishes that both Sally Williams and Angeline Williams recalled that there had been fights at the family home, and Angeline Williams testified that "we" were exposed to fighting. Although the term "we" unquestionably refers to the younger children in the house,

she also testified that there were a number of such children and did not discuss the nature or extent of defendant's involvement. Sally Williams spoke of a murder that took place at an aunt's house. When asked if defendant had been present and seen that murder, she responded: "I reckon he was standing around too. He had a—I don't know—he probably were on the outside where it—the shooting were at 'cause they was a lot of kids. . . . I can't say that he seen him shoot him . . . ." However, Sally Williams also testified without equivocation that defendant helped take the victim to seek medical help. Because of the family relationship between defendant and these witnesses and the uncertainties expressed in their testimony, we cannot say that this evidence contained the requisite manifest credibility to require the court to instruct the jury as to this mitigating circumstance in peremptory form.

[32] Finally, defendant requested a peremptory instruction on the nonstatutory mitigating circumstance that "as a child the Defendant witnessed his mother returning home with men at a drunken and half drunken state." At the charge conference, the trial court and counsel changed this circumstance to read that "as a child, the defendant was present in the home when his mother returned home with various men in a drunken state." When this circumstance was discussed at the charge conference, the judge stated, "I'm not inclined to give a peremptory. Does the defendant wish to be heard further?" Defense counsel responded, "No." The only evidence in the record to support this circumstance is Angeline Williams' testimony:

[DEFENSE COUNSEL]: Okay. And would there be men over there lots of times?

A. We had a lot of activity with male friends.

Q. Would they spend the night over there sometimes?

A. Yes, sir.

Q. And did this go on in front of all the children?

A. Yes, sir; it was very open.

The testimony in which the above-quoted questions are embedded deals with visitors who would drink, sometimes to excess. Nevertheless, the record contains no suggestion that defendant's mother would leave home to find these visitors or, having left home for whatever reason, would return with them. In addition, the instruction is ambiguous in that it could refer to the drunken state of either

the mother or the various men. Accordingly, the trial court properly refused defendant's request for this peremptory instruction.

These assignments of error are overruled.

**[33]** Defendant contends that he is entitled to a new capital sentencing proceeding because the trial court erred when it allowed the prosecutor to comment about defendant's failure to call his wife to testify. In his closing argument during the sentencing proceeding, the prosecutor stated:

> [Defendant and his counsel] called Dr. Mathew. Let's take a second and talk about him. One thing he talks about is how the things are going on in his life and what he's going through. You would think that they would call some people who would have said, "This was all the drugs he was doing that night" or, "This is how it happened." They could have called and said—the burden of persuasion is on them. They could have called Mercado Green, Aretha Herring, the one he was going to have sex with that night and go off in the room with. *Did they call his wife? Did they call his wife to testify?*

> [DEFENSE COUNSEL]: Objection.

> THE COURT: Overruled.

> [PROSECUTOR]: *Why do you think they didn't call his wife? Maybe 'cause she would have testified to something they didn't want to hear.*

> [DEFENSE COUNSEL]: Objection.

> THE COURT: Objection sustained. The jury will disregard that argument.

> [PROSECUTOR]: They didn't call all these people that would say, "Well, I know he's been doing drugs all his life." No. They called Dr. Mathew. And what did he say? And well, there's no need of getting into a whole lot of it.

(Emphasis added.) Section 8-57(a) states in pertinent part: "The spouse of the defendant shall be a competent witness for the defendant in all criminal actions, but the failure of the defendant to call such spouse as a witness shall not be used against him." N.C.G.S. § 8-57(a) (2001). We have interpreted this statute to mean that the failure of defendant's wife to testify on his behalf "shall not be used to [his] prejudice," *State v. McCall*, 289 N.C. 570, 575, 223 S.E.2d 334, 337

(1976), and have held that "[t]he rule applies with equal force to the argument of counsel when evidence forbidden by statute is argumentatively placed before the jury and used to the prejudice of the defense," *State v. Thompson*, 290 N.C. 431, 447, 226 S.E.2d 487, 497 (1976). Where such an argument is made, the trial court should provide a prompt peremptory instruction that the jury should disregard the argument and that the failure of the defendant to call his wife should not be held against him. *State v. Helms*, 218 N.C. 592, 596-97, 12 S.E.2d 243, 246 (1940).

In the case at bar, the trial court failed to sustain defendant's initial objection when the prosecutor strayed into improper territory. However, as soon as the prosecutor began to develop this theme, defendant renewed his objection. The trial court sustained the objection and instructed the jury to disregard "that argument."

In light of the unequivocal requirement for a detailed peremptory curative instruction set out in *Helms*, we agree with defendant that the trial court's actions were insufficiently detailed and therefore error. However, the error is not prejudicial unless "there is a reasonable possibility that, had the error in question not been committed, a different result would have been reached at the trial out of which the appeal arises. The burden of showing such prejudice under this subsection is upon the defendant." N.C.G.S. § 15A-1443(a). We note that every North Carolina Supreme Court case cited by defendant as to this issue was decided prior to the 1977 enactment of this statute. In the only cases cited by defendant that postdate the statute's enactment, *State v. Robinson*, 74 N.C. App. 323, 328 S.E.2d 309 (1985); *State v. Ward*, 34 N.C. App. 598, 239 S.E.2d 291 (1977), the North Carolina Court of Appeals ordered new trials but did not cite N.C.G.S. § 15A-1443. Because these cases did not include any analysis of the statutorily controlled standard of review, we find neither persuasive. In addition, unlike the case at bar, in neither *Robinson* nor *Ward* did the trial court give any curative instruction.

Our consideration of the entire record convinces us that defendant has failed to meet the burden established by the statute. Evidence of defendant's guilt was strong and included a confession. The jurors found all three submitted aggravating circumstances, but of the twenty-seven mitigating circumstances submitted, they found none that were statutory and only two that were nonstatutory. Although the trial court initially ruled incorrectly, it properly sustained the renewed objection before the prosecutor went much further. The court's curative instruction was ambiguous and incomplete, but

because a jury is presumed to follow a court's instructions, *see State v. Wiley*, 355 N.C. 592, 637, 565 S.E.2d 22, 52 (2002), we are reluctant to assume that it was also utterly ineffectual. Considering these factors together, we hold that defendant has failed to establish that a different verdict would have resulted if the trial court had sustained defendant's objection more promptly and given a properly detailed curative instruction. *See State v. Britt*, 320 N.C. 705, 709, 360 S.E.2d 660, 662 (1987) (even if error arose when defendant's wife was compelled to testify, in light of strength of State's case, no reasonable likelihood under N.C.G.S. § 15A-1443(a) that a different result would have been reached if the wife had not testified); *State v. Martin*, 105 N.C. App. 182, 189, 412 S.E.2d 134, 137 (no prejudicial error where prosecutor referred to the failure of the defendant's wife to testify because prosecutor was discussing her status as an employee of the defendant's company; court sustained the defendant's objection but did not provide curative instruction), *appeal dismissed and disc. rev. denied*, 331 N.C. 556, 418 S.E.2d 670 (1992). This assignment of error is overruled.

[34] Defendant contends that the trial court's instructions to the jury regarding the pecuniary gain aggravating circumstance, N.C.G.S. § 15A-2000(e)(6), were erroneous because the instructions allowed the jury to find the aggravating circumstance without finding that the motive for the murder was pecuniary gain. Defendant argues that the instructions were plain error, erroneous in law, and in violation of the Eighth and Fourteenth Amendments to the United States Constitution.

During the capital sentencing proceeding, the trial court conducted an informal charge conference outside the presence of the jury in which the prosecutor requested that the trial court submit the (e)(6) aggravating circumstance to the jury. Defendant objected on the grounds that it would be inappropriate to submit that circumstance because the jury had convicted defendant of murder under the felony murder rule and because the murder in this case "was more of a murder-for-hire situation than a robbery situation." After considering arguments by both the prosecution and defense counsel, the trial court indicated that it would submit the aggravating circumstance. Thereafter, at the close of the evidence, the trial court conducted an official charge conference and reiterated its intention to submit the (e)(6) circumstance to the jury. Defendant's counsel then responded, "I don't have any objection to that." The trial court subsequently instructed the jury as follows:

The second aggravating circumstance that you will consider is[,] was this murder committed for pecuniary gain? A murder is committed for pecuniary gain if the defendant, when he commits it, has . . . obtained, or intends or expects to obtain, money or some other thing which can be valued in money, either as compensation for committing it, or as a result of the death of the victim. If you find from the evidence beyond a reasonable doubt[] that when the defendant killed the victim, the defendant took money from the victim, you would find this aggravating circumstance, and would so indicate by having your foreperson write, "Yes," in the space after this aggravating circumstance on the "Issues and Recommendation" form. If you do not so find, or have a reasonable doubt as to one or more of these things, you will not find this aggravating circumstance and will so indicate by having your foreperson write, "No," in that space.

The jury found the (e)(6) circumstance to exist.

Because defendant did not object to the trial court's instructions, we review for plain error. *State v. Bacon*, 337 N.C. 66, 99, 446 S.E.2d 542, 559 (1994), *cert. denied*, 513 U.S. 1159, 130 L. Ed. 2d 1083 (1995). "Under this standard, defendant must show that the instructions were erroneous and that absent the erroneous instructions, a jury probably would have returned a different verdict." *State v. Lucas*, 353 N.C. at 584, 548 S.E.2d at 723. "The error in the instructions must be 'so fundamental that it denied the defendant a fair trial and quite probably tilted the scales against him.' " *Id.* (quoting *State v. Collins*, 334 N.C. 54, 62, 431 S.E.2d 188, 193 (1993)).

We previously have rejected virtually identical arguments as that raised by defendant here. *See State v. Davis*, 353 N.C. 1, 35-37, 539 S.E.2d 243, 266-67 (2000), *cert. denied*, 534 U.S. 839, 151 L. Ed. 2d 55 (2001); *State v. Bishop*, 343 N.C. at 556-57, 472 S.E.2d at 862-63; *State v. Bacon*, 337 N.C. at 99-100, 446 S.E.2d at 559-60; *State v. Jennings*, 333 N.C. 579, 620-22, 430 S.E.2d 188, 209-10, *cert. denied*, 510 U.S. 1028, 126 L. Ed. 2d 602 (1993). Similarly, in this case, we decline to find plain error in the trial court's instructions.

## PRESERVATION ISSUES

Defendant raises additional issues that he concedes have been decided against him by this Court. Defendant argues that the short-form murder indictment returned against him was invalid on its face

and that the trial court consequently lacked jurisdiction to try and to sentence him. However, we have consistently held that the short-form indictment is sufficient to charge a defendant with first-degree murder. *State v. Braxton*, 352 N.C. at 174, 531 S.E.2d at 437; *State v. Wallace*, 351 N.C. 481, 508, 528 S.E.2d 326, 343, *cert. denied*, 531 U.S. 1018, 148 L. Ed. 2d 498 (2000). Defendant claims the instruction that the murder was "especially heinous, atrocious, or cruel," given pursuant to N.C.G.S. § 15A-2000(e)(9), was unconstitutionally vague. The trial court submitted this aggravating circumstance to the jury pursuant to pattern jury instruction 150.10. We have repeatedly determined that the pattern jury instructions for the (e)(9) aggravating circumstance are not unconstitutionally vague and are proper. *State v. Syriani*, 333 N.C. 350, 388-92, 428 S.E.2d 118, 139-41, *cert. denied*, 510 U.S. 948, 126 L. Ed. 2d 341 (1993).

Defendant maintains the trial court erroneously submitted the aggravating circumstance that the felony was committed for pecuniary gain pursuant to N.C.G.S. § 15A-2000(e)(6), when the first-degree murder conviction is based solely on felony murder involving armed robbery. We have consistently upheld the submission of the (e)(6) aggravating circumstance in cases involving felony murder where armed robbery is the underlying felony. *State v. Cummings*, 353 N.C. 281, 303, 543 S.E.2d 849, 862-63, *cert. denied*, 534 U.S. 965, 151 L. Ed. 2d 286 (2001); *State v. Chandler*, 342 N.C. 742, 755, 467 S.E.2d 636, 644, *cert. denied*, 519 U.S. 875, 136 L. Ed. 2d 133 (1996). Defendant argues the trial court committed error by instructing the jury that in considering Issues Three and Four, the jurors *may* rather than *must* consider mitigating circumstances found in Issue Two of the "Issues and Recommendation as to Punishment" form. We have approved the use of the pattern jury instructions in this regard and have upheld similar language as being consistent with the requirements under the statute. *State v. Gregory*, 340 N.C. at 417-19, 459 S.E.2d at 668-69. Defendant contends the trial court erred when it instructed the jury that defendant had the burden to *satisfy* it as to the existence of mitigating circumstances. We have previously approved of similar instructions to the jury. *State v. Payne*, 337 N.C. 505, 531-33, 448 S.E.2d 93, 108-09 (1994), *cert. denied*, 514 U.S. 1038, 131 L. Ed. 2d 292 (1995). Although defendant argues the North Carolina capital sentencing scheme, N.C.G.S. § 15A-2000, is vague and overbroad, we have consistently upheld the constitutionality of this procedure. *State v. Powell*, 340 N.C. 674, 695, 459 S.E.2d 219, 230 (1995), *cert. denied*, 516 U.S. 1060, 133 L. Ed. 2d 688 (1996). We have

**STATE v. BARDEN**

[356 N.C. 316 (2002)]

considered defendant's arguments on these additional issues and find no compelling reason to depart from our prior holdings.

These assignments of error are overruled.

## PROPORTIONALITY

[35] We turn now to the appropriateness of the death penalty. Defendant argues that the capital sentence should not stand because it was "imposed under the influence of passion, prejudice, or any other arbitrary factor." N.C.G.S. § 15A-2000(d)(2). In support of this, defendant first contends that the prosecutor's comments to the judge before trial show that racial prejudice was a part of the charging decision. Defendant also argues the prosecutor improperly considered in his charging decision an unrelated murder that occurred about the same time.

According to the record, the trial judge conferred with the prosecutor and the defense team before the trial began. The prosecutor explained that one of the reasons the case was being tried capitally was that he anticipated that three aggravating circumstances would apply. He went on to say:

> We have a Hispanic male [victim], as brutal a killing as it can be. We have another killing that happened about two or three days earlier that had to do with a school teacher that was stabbed in just a brutal, bloody killing that happened two or three days earlier. We thought we had, at one point, a mass murderer on our hands. And fortunately, it was two different people.

However, the prosecutor then added:

> In light of the amount of aggravating factors, the prior aspects of it, we just felt like, you know, for a lot of reasons, that it just would not, in apportionality-wise or fairness-wise, if we're going to try capital cases, this is a capital case that needs to be tried as capitally. It just—I feel like the situation calls for the ultimate penalty.

This exchange demonstrates that the prosecutor based his decision to seek the death penalty on the number of aggravating circumstances, the seriousness of the case, and the treatment of other similar cases. The prosecutor has discretion to consider numerous factors in determining whether a murder case should be tried capitally. *State v. Lineberger*, 342 N.C. 599, 603-04, 467 S.E.2d 24, 25-26 (1996). We do not believe that the prosecutor's mention of the vic-

tim's race or of an unrelated murder indicates that the charging decision was either driven by or tainted by improper factors.

Defendant next argues that the trial court's comments to defendant at the conclusion of the sentencing proceeding show that the sentence was imposed under the influence of passion and prejudice. After the court passed sentence, the trial court complimented all counsel for the professionalism demonstrated during trial. The judge then spoke to the defendant, saying:

> Mr. Barden, I feel like I would be remiss if I didn't say that even under the difficult situation of being here on trial you've conducted yourself well. You are to be commended for that because I know that it doesn't have to be that way. It's a difficult situation. I do appreciate that and I wish you good luck under very bad circumstances.

These comments reflect the experienced trial judge's awareness that capital defendants can be obstreperous, troublesome, and even dangerous at trial. We fail to see any impropriety whatsoever in the judge's humane words of encouragement to a defendant who has just been told he is going to die.

Defendant next contends that the prosecutor's comments about witnesses not called by defendant led the jury to consider arbitrary factors and that the prosecutor's introduction of the victim's character resulted in a verdict that was imposed under the influence of passion. We have considered these contentions earlier in this opinion and found no error. Upon further consideration in the context of N.C.G.S. § 15A-2000(d)(2), we do not find that these arguments by the prosecutor undermine the validity of the sentence.

Finally, defendant argues that the jury's failure to find twenty-five of the twenty-seven submitted mitigating circumstances was irrational and demonstrated that the verdict was imposed under the influence of passion and prejudice. While we are not privy to the jury's deliberations, our review of the record satisfies us that the jurors did not behave irrationally. The jury picked and chose among the submitted circumstances, indicating that each circumstance was individually considered. Moreover, the verdict form called for a "yes" response only if any juror found that a mitigating circumstance existed *and* had mitigating value. Thus, jurors may have found that submitted circumstances existed but did not have mitigating value. In the absence of any evidence that the jury failed to follow the court's

instructions, we decline to speculate as to the jury's rationale as to each circumstance.

[36] Although defendant has not raised a proportionality argument in his brief, N.C.G.S. § 15A-2000(d)(1) and (2) require that we undertake a review to determine whether the sentence of death is proportionate. We also consider whether the record supports the aggravating circumstances found by the jury. The State's brief includes an argument that the sentence was proportionate.

The jury's recommendation of death is supported by three aggravating circumstances. It found that defendant had committed a prior crime of violence, pursuant to N.C.G.S. § 15A-2000(e)(3). The record readily establishes this prior conviction, and the rape victim testified to the violence of the offense. The jury also found that the offense was committed for pecuniary gain, pursuant to N.C.G.S. § 15A-2000(e)(6). As noted above, the evidence fully supports this circumstance. Finally, the jury found that the murder was especially heinous, atrocious, or cruel, pursuant to N.C.G.S. § 15A-2000(e)(9). The evidence showed that defendant bludgeoned the victim in the head numerous times, apparently changing weapons during the course of the attack, and that defendant acknowledged that the victim may have been alive after the attack but took no steps to assist him. In addition, defendant instituted the attack only after the victim, who had already loaned defendant money once that night, refused to make a second loan of twenty dollars. Defendant's attack began after the victim turned his back to defendant to resume his duties at work. This evidence supports the jury's finding that the murder was especially heinous, atrocious, or cruel.

In conducting our proportionality review, we compare the case at bar with other appropriate cases, as defined in *State v. Williams*, 308 N.C. 47, 79, 301 S.E.2d 335, 355, *cert. denied*, 464 U.S. 865, 78 L. Ed. 2d 177 (1983), and *State v. Bacon*, 337 N.C. at 103, 446 S.E.2d at 562. This review takes into account the particular facts and circumstances of each case, and no single factor is necessarily dispositive. The determination whether a sentence is disproportionate "ultimately rest[s] upon the 'experienced judgments' of the members of this Court." *State v. Green*, 336 N.C. at 198, 443 S.E.2d at 47.

This Court has found a death sentence disproportionate in seven cases. *State v. Benson*, 323 N.C. 318, 372 S.E.2d 517; *State v. Stokes*, 319 N.C. 1, 352 S.E.2d 653 (1987); *State v. Rogers*, 316 N.C. 203, 341

S.E.2d 713 (1986), *overruled on other grounds by State v. Gaines,* 345 N.C. 647, 483 S.E.2d 396, *and by State v. Vandiver,* 321 N.C. 570, 364 S.E.2d 373; *State v. Young,* 312 N.C. 669, 325 S.E.2d 181 (1985); *State v. Hill,* 311 N.C. 465, 319 S.E.2d 163 (1984); *State v. Bondurant,* 309 N.C. 674, 309 S.E.2d 170 (1983); *State v. Jackson,* 309 N.C. 26, 305 S.E.2d 703 (1983). In only two of these cases did the jury find the murder to be especially heinous, atrocious, or cruel, and each of these cases is distinguishable from the case at bar. In *Stokes,* the seventeen-year-old defendant was the only one of three assailants to receive the death penalty. *State v. Stokes,* 319 N.C. at 19-27, 352 S.E.2d at 663-68. According to the warrants in the case at bar, defendant was forty-one years old at the time of the offenses and thus possessed the maturity to understand the significance of his acts. Because defendant in the case at bar acted alone, no other jury could have found that others involved in the assault deserved a life sentence. In *Bondurant,* the victim not only indicated remorse after shooting the victim, he took the victim to the hospital. *State v. Bondurant,* 309 N.C. at 692-95, 309 S.E.2d at 181-83. By contrast, defendant in the case at bar abandoned the victim, who may have been still alive, then took steps to hide his involvement in the offenses.

In addition, in none of the cases listed above was the defendant found to have committed a prior violent felony, pursuant to N.C.G.S. § 15A-2000(e)(3). This Court has held that such a finding of recidivism is a significant consideration in determining the proportionality of a death sentence. *State v. Harris,* 338 N.C. 129, 161, 449 S.E.2d 371, 387 (1994), *cert. denied,* 514 U.S. 1100, 131 L. Ed. 2d 752 (1995).

We believe the case at bar is significantly similar to *State v. Call,* 353 N.C. 400, 545 S.E.2d 190. In *Call,* the defendant lured the victim to a remote cornfield by asking for the victim's help. While the victim's back was turned, the defendant fatally beat the victim on the head with a shovel, then with an iron bar. The jury found as aggravating circumstances that the murder was committed during the course of a kidnapping, N.C.G.S. § 15A-2000(e)(5); that the murder was committed for pecuniary gain, N.C.G.S. § 15A-2000(e)(6); that the murder was especially heinous, atrocious, or cruel, N.C.G.S. § 15A-2000(e)(9); and that the murder was part of a course of conduct in which defendant engaged and which included the commission by defendant of other crimes of violence against another person or persons, N.C.G.S. § 15A-2000(e)(11). Although the jury also found two statutory mitigating circumstances and four nonstatutory mitigating circumstances, the jury recommended a death sentence. We held that the

IN RE HAYES

[356 N.C. 389 (2002)]

death sentence was not disproportionate. *State v. Call*, 353 N.C. 400, 545 S.E.2d 190.

Based upon the facts of the case at bar and the treatment of other similar cases, we are satisfied that the death penalty recommended by the jury and ordered by the trial court is not disproportionate. As detailed above, the case is remanded for a *Batson* hearing. In all other respects, defendant received a fair trial and capital sentencing proceeding, free from prejudicial error.

REMANDED FOR *BATSON* HEARING; OTHERWISE NO ERROR.